**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAHAJEEWA RATHNAKUMARA LOKU
KANKANAMGE DON, SHIYAMALIE
AMARATUNGA ACHTHI, MINUL
THANKULA KANKANAMGE,
                    *Petitioners,*

v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent.*

No. 03-74431

Agency Nos.
A79-519-692
A79-519-693
A79-519-694

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
March 10, 2006—Pasadena, California

Filed February 9, 2007

Before: Kim McLane Wardlaw and Johnnie B. Rawlinson,
Circuit Judges, and Richard F. Cebull,* District Judge.

Opinion by Judge Rawlinson;
Dissent by Judge Wardlaw

---

*The Honorable Richard F. Cebull, United States District Judge for the
District of Montana, sitting by designation.

## COUNSEL

Dan E. Korenberg (briefed), Orit Levit (argued), Korenberg, Abramowitz & Feldun, Sherman Oaks, California, for the petitioners.

Emily Anne Radford (briefed), David E. Dauenheimer (argued), Office of Immigration Litigation, United States Dept. of Justice, Civil Division, Washington, D.C., for the respondent.

## OPINION

RAWLINSON, Circuit Judge:

Petitioners Sahajeewa Rathnakumara Loku Kankanamge Don (Don), his wife, Shiyamalie Amaratunga Achthi, and their minor son, Minul Thankula Kankanamge,[1] natives and

---

[1] Don is the principal or lead petitioner; his wife's and child's petitions are derivative of his petition. Therefore, their asylum claims succeed or fail with Don's claims. *See Kumar v. Gonzales*, 439 F.3d 520, 521, 525 (9th Cir. 2006).

citizens of Sri Lanka, legally entered the United States in 2000 as visitors and overstayed their allotted time. They conceded that they are removable, but requested asylum, withholding of removal, and protection under the Convention Against Torture (CAT), based on alleged persecution by the Liberation Tigers of Tamil Eelam (LTTE), a rebel terrorist group in Sri Lanka also referred to as the Tamil Tigers. They also alleged persecution by the Terrorist Detective Bureau (TDB), a special unit of the Sri Lankan government formed by the army and police. They petition for review of the decision of the Board of Immigration Appeals (BIA) adopting and affirming the adverse credibility determination of the Immigration Judge (IJ) and the concomitant denial of asylum.[2] Because substantial evidence supports the adverse credibility determination, we deny the petition.

## I.  BACKGROUND

Don alleges that he and his family received threats of physical harm from both the LTTE and the TDB, because a cook employed at the restaurant owned by Don was arrested by the TDB as a suspected LTTE terrorist. Don testified before the Immigration Judge (IJ) that prior to that incident in January 2000, he and his family were not threatened or harmed by the government or any terrorist groups, he did not support nor was he active in any political group, and he did not know that the cook was a Tamil Tiger until his arrest. Don stated that subsequently his life was threatened by the LTTE once in person outside of Colombo, and repeatedly by telephone, specifically warning that Don would be harmed if he did not get the police to release his former cook. Don speculated that the LTTE believed he had informed the TDB about the cook's LTTE connection, but offered no direct testimony on that

---

[2]The IJ also denied withholding of removal and CAT protection. However, Petitioner has abandoned these claims by failing to discuss them in his Opening Brief. *See United States v. Williamson*, 439 F.3d 1125, 1137-38 (9th Cir. 2006).

point. The LTTE never came to Don's home, and neither he nor his family was physically harmed.[3] Don agreed to try to get the cook released, and contacted several of his friends at the police station where the cook was imprisoned. He also submitted translated copies of several police reports made by his wife and him reporting death threats from the LTTE.

Don testified that he fled from his home to live in safety with relatives and, in his absence, the TDB came to his home twice to question him and requested that his wife convey a message to him to contact the TDB. Don's wife testified that the TDB told her that if her husband did not come to the TDB headquarters, he would "know what is going to happen." Don stated that he fears the TDB because of atrocities committed by the TDB in 1990, and that he told the Colombo police that he was afraid because the TDB was looking for him. He further testified that he spoke to the TDB by telephone and told them about the police reports that he made concerning the LTTE, but he never showed the reports to the TDB.

In support of his application, Don submitted a newspaper article reporting that an LTTE terrorist working at the Chinese Restaurant in Padukka was arrested and the TDB was unable to "interrogate" the unnamed owner of the restaurant, who fled. Don introduced into evidence a copy of his business license to establish that he was one of two partners owning a Chinese restaurant in Padukka. However, the IJ noted a discrepancy between the license date on the translated copy and the original.

The IJ cited material inconsistencies in Don's testimony and the evidence related to the LTTE threats, and found Don's account of threats from the TDB to be implausible.

---

[3]Don testified that some "unknown" people were hanging around his house after he left and "unidentified" persons stoned his house, but these people were not identified as individuals affiliated with the LTTE or the TDB.

Consequently, the IJ found that Don had not "made a credible and plausible claim for asylum let alone that it is more likely than not that he would be subjected to persecution on any grounds should he return."

The BIA summarily affirmed the IJ's decision stating: "The Immigration Judge's conclusions regarding the inconsistencies in the respondent's testimony form a sufficient basis for an adverse credibility finding." Don timely appealed.

## II. STANDARDS OF REVIEW

Where the BIA adopts the decision of the IJ, we review the IJ's decision. *See Karouni v. Gonzales*, 399 F.3d 1163, 1170 (9th Cir. 2005). The standard of review for factual findings made by the IJ is a deferential substantial evidence standard, and credibility findings will be upheld unless the evidence *compels* a contrary result. *Id.* (emphasis added). This deferential standard of review "precludes relief absent a conclusion that no reasonable factfinder could have reached the agency's result." *Thangaraja v. Gonzales*, 428 F.3d 870, 874 (9th Cir. 2005) (citation and internal quotation marks omitted).

## III. DISCUSSION

### A. Adverse Credibility Determination

[1] When the IJ denies asylum based "on an adverse credibility determination, he must provide specific, cogent reasons to support his determination . . . [which] cannot be peripheral, but rather must go to the heart of petitioner's claim."[4] *Desta v. Ashcroft*, 365 F.3d 741, 745 (9th Cir. 2004) (citations and internal quotation marks omitted). Also, the IJ "must provide a petitioner with a reasonable opportunity to offer an explana-

---

[4]The REAL ID Act changed this requirement effective for asylum applications filed after May 5, 2005. *See Kaur v. Gonzales*, 418 F.3d 1061, 1064 n.1 (9th Cir. 2005).

tion of any perceived inconsistencies that form the basis of a denial of asylum." *Ordonez v. INS*, 345 F.3d 777, 786 (9th Cir. 2003).

The IJ based his adverse credibility finding on inconsistency in the evidence presented regarding a crucial date, the implausibility of Don's account, and Don's propensity for dishonesty.

## 1.  Inconsistency in Evidence Presented Regarding a Crucial Date

[2] Don provided the police "a date in writing" that the cook started working for him six months prior to the cook's arrest in 2000, his testimony was that the cook was hired in 1996, and in his interview with the Immigration Officer he stated that the cook began work in 1998. The IJ questioned Don about the discrepancies and Don admitted that he lied to the police in Sri Lanka[5] and did not remember the correct date when he was interviewed by the Immigration Officer. Nevertheless, Don professed to remember the actual date at the hearing.[6] The IJ made an adverse credibility finding because of the lack of consistency about the important detail (date of employment) regarding the cook. Don's inability to "state as to when it was that this man who was the source of him having to flee his country started to work for him" went to the heart of Don's claim because it involved the very event upon which he predicated his claim for asylum. *See Chebchoub v. INS*, 257 F.3d 1038, 1043 (9th Cir. 2001) (explaining that inconsistencies in the details of events that form the basis for the asylum claim, specifically "testimony about the events

---

[5]Admission of prior dishonesty can support an adverse credibility determination. *See Kaur*, 418 F.3d at 1065.

[6]A statement that one's memory is better now than it was earlier supports an inference of untruthfulness. *See Kelly v. City of San Jose*, 114 F.R.D. 653, 667 (N.D. Cal. 1987) (recognizing that memory is fresher "closer in time to the subject events.").

leading up to [petitioner's] departure," go to the heart of the claim, and support an adverse credibility finding); *see also, Singh v. Gonzales*, 439 F.3d 1100, 1108 (9th Cir. 2006) (affirming that "[a] single supported ground for an adverse credibility finding is sufficient if it relates to the basis for petitioner's alleged fear of persecution and goes to the heart of the claim," and "[a]n inconsistency goes to the heart of a claim if it concerns events central to petitioner's version of why he was persecuted and fled") (citations, alteration, and internal quotation marks omitted).

[3] Although trivial discrepancies in dates cannot support an adverse credibility determination, *see Kaur*, 418 F.3d at 1065, the lack of details regarding the event that allegedly spurred the LTTE and the TDB to threaten Don goes to the heart of his persecution claim and is not trivial, particularly since Don's testimony is vital to his claim that the terrorist cook was in his employ at the time of the arrest.[7] *See Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997) (affirming that "discrepancies relat[ing] to the basis for [an] alleged fear of persecution . . . support [a] negative credibility finding.") (citations omitted); *see also Singh*, 367 F.3d at 1142-43 (upholding adverse credibility finding where discrepancy about date of key event "caused doubt about whether the [event] had occurred at all").

---

[7]Don submitted a newspaper article which reported that a LTTE terrorist was arrested at a Chinese restaurant in Padukka and the owner fled before the TDB could interrogate him. Only Don's testimony identified the terrorist as his cook and himself as the owner of the specific Chinese restaurant referred to in the article. However, the business license submitted by Don indicated that there were two owners of a Chinese restaurant in Padukka, and the IJ specifically inquired about discrepancies in the character of the business and the license date. When documentary evidence offered to support a claim is questionable, an adverse credibility determination is supported. *See Singh v. Ashcroft*, 367 F.3d 1139,1143 (9th Cir. 2004) (refusing to credit documents that appeared back-dated, did not show the claimed injuries and omitted described medical treatment).

**[4]** Don's assertion that lying about the employment date did not enhance his persecution claim and is therefore not relevant to a credibility determination is unpersuasive. Although generally, if the inconsistency does not "enhance" the applicant's persecution claim, it will not be relevant to the credibility determination, *see Lin v. Gonzales*, 434 F.3d 1158, 1165 n.2 (9th Cir. 2006), "when inconsistencies that weaken a claim for asylum are accompanied by other indications of dishonesty — such as a pattern of clear and pervasive inconsistency or contradiction — an adverse credibility determination may be supported by substantial evidence." *Kaur*, 418 F.3d at 1067.

The dissenting opinion excuses this critical discrepancy by referencing Don's "explanation that he lied to police in Sri Lanka regarding the cook's hiring date because he was afraid for his life and he did not want the police to accuse him of being affiliated with the LTTE." Dissenting Opin., p.1632. However, this excuse does not explain why Don provided different dates to the asylum officer and to the IJ. Contrary to the dissenting opinion's argument, dissenting opin., p.1632, the IJ explicitly rejected Don's testimony because of the IJ's conclusion that the discrepant dates given by Don were "critical facts" that prevented a "positive credibility finding." The fact that the IJ admitted the referenced newspaper article and business license into evidence does not mean that the IJ retreated in any way from his adverse credibility determination. Nothing in the IJ's decision suggests otherwise.

Our colleague in dissent describes the majority's reliance on *Singh v. Gonzales*, 439 F.3d 1100 (9th Cir. 2006), as "mistaken" and "misplaced." Dissenting Opin., pp.1633-34. However, in *Singh*, 439 F.3d at 1108, we articulated the unremarkable principle that "[a]n inconsistency goes to the heart of a claim if it concerns events central to petitioner's version of why he was persecuted and fled." The same premise may be found in other cases cited by the majority, which are not questioned in the dissenting opinion. *See Singh v. Ash-*

*croft*, 367 F.3d 1139, 1142-43 (9th Cir. 2004); *see also Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997).

**[5]** The approach taken in the dissenting opinion amounts to an impermissible re-weighing of the evidence. *See Singh v. INS,* 134 F.3d 962, 969 n.14 (9th Cir. 1998) ("[W]e may not reweigh the evidence . . . We merely determine whether the evidence *compels* such a conclusion." (emphasis in the original)). The IJ specified "other indications of dishonesty," including lying to the police and to the LTTE. The evidence does not compel a finding that the IJ impermissibly relied on these "indications of dishonesty" in making his adverse credibility determination. *See Karouni*, 399 F.3d at 1170 (explaining that adverse credibility determinations must be upheld "unless the evidence compels a contrary result.") (citation omitted).

## 2.   Implausible Story of Fearing the TDB

**[6]** The IJ pointed to other objective evidence in the record that eroded Don's credibility, particularly Don's implausible account of feared persecution from the TDB, a Sri Lankan combined police and army force. The IJ considered Don's story implausible because Don had relatives in the police department and had gone to the police station to report threats from the LTTE. The record further indicates that Don contacted friends who could influence the TDB to release the cook, and spoke to the TDB by telephone, describing filed police reports addressing the LTTE threats. These interactions with the TDB undermine Don's claim that he was evading the TDB. Also, if he feared the TDB, it is implausible that he would bring attention to himself by telling the police in Colombo that he feared the TDB because the TDB was looking for him. Substantial evidence supports the IJ's adverse credibility determination on this point. *See Jibril v. Gonzales*, 423 F.3d 1129, 1135 (9th Cir. 2005) (noting that "testimony that is implausible in light of the background evidence can

support an adverse credibility finding") (citation, emphasis, and internal quotations marks omitted).

The dissenting opinion also takes issue with the implausibility determination made by the IJ, primarily on the basis that the record does not support the finding that Don had friends in the police department who could influence the TDB. Dissenting Opin., p.1645. Yet, ten pages earlier the dissenting opinion expressly references the fact that Don contacted his friends in the local police to get the cook released.

The dissent essentially contends that the country reports and other evidence *compel* the conclusion that the local police have *no* influence with the TDB. If this is the case, then why did Don seek the help of the local police to earn the cook's release, even though the cook was arrested by the TDB? Moreover, if the cook was arrested by the TDB, why was he being held in a jail where Don believed his friends in the local police might have influence? Respectfully, the dissent makes a number of points that may well have led a majority of this panel to conclude differently than the IJ, were we reviewing the matter *de novo*. However, we cannot say that the evidence *compels* a contrary result.

### 3. Propensity for Dishonesty

The IJ found that Don had a "propensity for not telling the truth." Don admitted lying to the Sri Lankan police and to the LTTE, because he was afraid of what would happen if he told the truth. *See Kaur*, 418 F.3d at 1065 (concluding that "[i]t strains credulity to hold that the evidence presented at the asylum hearing compels us to find Kaur believable for the sole reason that she admitted to being a liar."); *see also, Garrovillas v. INS*, 156 F.3d 1010, 1014 (9th Cir. 1998) ("If the inconsistency were accompanied by other indications of dishonesty, we might deem the BIA's finding justified."); *Kaur*, 418 F.3d at 1066 ("[W]hen the inconsistency is accompanied by other indications of dishonesty, such testimony might in fact sup-

port an adverse credibility finding.") (citation, alteration and emphasis omitted). "[I]t is incumbent upon the IJ to view each portion of an alien's testimony, not solely as independent pieces of evidence with no bearing on the testimony as a whole, but in light of all of the evidence presented." *Id.*

**[7]** The dissenting opinion chastises the majority for failing to adequately explore the motivations for Don's untruths. Dissenting Opin., p.1637. However, the IJ did not act inappropriately in questioning whether Don feared the police, when his relatives and friends worked there. In addition, Don insisted that he did not lie to the LTTE even though he previously testified that he lied to the LTTE for the purpose of "buying time."

In sum, the majority opinion follows the extremely deferential standard of review that guides our analysis. Because we are not *compelled* to reach a conclusion contrary to that of the IJ, we must deny the petition. *See Karouni*, 399 F.3d at 1170.

## B. Adequate Consideration of All Relevant Evidence

**[8]** Citing *Zavala-Bonilla v. INS*, 730 F.2d 562, 567 (9th Cir. 1984), Don asserts that the IJ abused his discretion by not adequately considering all relevant evidence, including the newspaper article about the cook's arrest, and the country reports. However, the IJ accepted the newspaper article into evidence, discussed it with Don, and referenced it in his decision. The IJ also admitted the country reports into evidence, heard testimony from Don's wife that the LTTE remained a strong terrorist group that "can kill everyone in the family," and accepted the fact that the LTTE was still an active terrorist group in Sri Lanka. Thus, the IJ considered the relevant facts presented by the article and the country reports in conformance with Don's assertion "that the LTTE and TDB can still pose a considerable threat" *generally*. The country reports and the article do not, however, support Don's contention that the LTTE and TDB are a considerable threat to him person-

ally. *See Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir. 2000) (recognizing that a claim based solely on general civil strife or widespread random violence is not sufficient to establish an objective fear of future persecution).

**[9]** The IJ adequately considered all relevant evidence in his decision, as he specifically acknowledged, *inter alia*, the facts and circumstances reflected in the newspaper article and the country reports admitted in evidence. *See Lopez v. Ashcroft*, 366 F.3d 799, 807 (9th Cir. 2004) (affirming that "the [IJ] does not have to write an exegesis on every contention. What is required is merely that it consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.") (citation and alteration omitted). The IJ adequately articulated his decision, and did not abuse his discretion by failing to interpret the evidence in the manner advocated by Petitioner.

## IV. CONCLUSION

**[10]** Although a reasonable factfinder *could* have found Petitioner credible, no such finding is *compelled* by the evidence. Because a reasonable factfinder could have reached this result, we must uphold the IJ's decision. *See Thangaraja*, 428 F.3d at 874.

**PETITION DENIED.**

---

WARDLAW, Circuit Judge, dissenting:

I respectfully must dissent from the majority in this particularly compelling case for asylum by a refugee from Sri Lanka, a country our State Department describes as rife with persecution of its citizens by both the government and terrorist organizations. Don had no choice but to flee Sri Lanka with his

wife and two-year-old baby, leaving behind the rest of his family and two successful businesses, to escape persecution by both the Terrorist Detective Bureau ("TDB"), a government security agency, and the Liberation Tigers of Tamil Eelam ("LTTE"), an extremely powerful and violent terrorist group.

After Moorthi Sennan, a cook in Don's restaurant, was arrested for being a suspected terrorist, both the LTTE and the TDB harassed and threatened Don and his family. Don reported the threats to local police and asked for protection, but the local police did nothing except warn Don to be careful. The LTTE accused Don of being the one who turned Moorthi over to the authorities and threatened to kill Don and his family if Moorthi was not released in one week. Don understandably promised the LTTE he would do whatever he could to free Moorthi. Don filed another report with the local police and then went into hiding. According to neighbors, Don's house was ransacked and the TDB came to his home to arrest him for aiding and harboring a terrorist. Based on the reputation of the TDB, Don believed that the TDB would "torture him endlessly" trying to get information about the LTTE. Don was caught in an impossible situation: The terrorists were threatening to kill him for cooperating with the government security forces, and the government security forces were accusing him of aiding the terrorists.

The evidence in the administrative record compels the finding that Don's account of being persecuted by both the TDB and the LTTE is truthful. His testimony is corroborated by undisputed documents, as well as State Department Country Reports. Sadly, for Don and his family, the Immigration Judge disregarded the record, instead basing his findings largely on what he has gleaned from watching American television.[1] The IJ impermissibly based his adverse credibility finding on: (1) a minor inconsistency regarding the hiring date of

---

[1]The IJ even refers to the "male respondent," Don, as the "main actor."

the cook, even though the events leading to Don's persecution began when the cook was *arrested*, not hired; (2) a generalization that Don has a propensity for dishonesty which the IJ based on Don's having lied to the police about Moorthi's hiring date to minimize his association with a suspected terrorist and Don's promise to the LTTE that he would try to get Moorthi released, which he failed to fulfill; and (3) a finding that Don's account is implausible because "assuming everything this man says is true," everyone involved should have been able to "sit down at a table" and straighten things out like they do on American television.

A review of the entire record compels the finding that Don's testimony is credible.[2] The majority, by erroneously concluding that substantial evidence supports the IJ's adverse credibility decision, places our court's imprimatur on a sloppy, illogical and barely coherent six-page IJ opinion. Because "each of the IJ's . . . proffered reasons for an adverse credibility finding fails," *Kaur v. Ashcroft*, 379 F.3d 876, 890 (9th Cir. 2004), and not one goes to the heart of Don's asylum claim, *see Desta v. Ashcroft*, 365 F.3d 741, 745 (9th Cir. 2004), we should reverse the negative credibility finding and remand to the BIA for a determination of whether Don is eligible for asylum, taking his testimony as true.

## A.  Inconsistent Hiring Date of the Cook

The IJ primarily relied upon the inconsistency in the hiring date of Moorthi, the cook, to support his adverse credibility determination. However, discrepancies as to Moorthi's hiring date do not go to the heart of Don's asylum claim because the key event triggering Don's persecution by the LTTE and the

---

[2]The majority accuses the dissent of "reweighing" the evidence. I agree that reweighing the evidence would be improper; however, it is quite proper to review the *entire* record, including evidence admitted by the IJ, such as the newspaper article and Don's business license demonstrating the truth of his testimony, in applying the proper legal standard.

TDB was Moorthi's *arrest* in January 2000, not the date he was hired, which was four years earlier.

Before Moorthi's arrest, Don had no inkling of Moorthi's alleged involvement with the LTTE. As the IJ himself states:

> Neither of the two adult respondents had any political activity, were never arrested and never physically harmed or mentally abused. There may have been some mental fear in there but the truth is that they had nothing to fear at before an event in January 2000.

Thus, it was only *after* Moorthi was arrested that Don's troubles with the LTTE and the TDB began, as the IJ seems to recognize. One week after Moorthi was arrested and charged, the LTTE stopped Don's car and threatened him with injury if he did not get the cook released from custody. The LTTE also stated in a threatening phone call that it knew Don was the one who reported Moorthi to the police, and that he and his family would suffer the penalty of death for his betrayal. Aware of the LTTE's lethal reputation, and afraid for his life and the lives of his family, Don responded that he would try to free Moorthi. Don contacted some people he knew in the local police, but was unable to get Moorthi released. After receiving threatening phone calls from the LTTE twice a week for several weeks, Don moved in with friends. However, his wife remained at home and continued to receive calls from the LTTE, who threatened to kill Don if Moorthi was not released.

Two months after Moorthi's arrest, the TDB came to Don's house and told his wife that Don should come to the TDB headquarters for questioning. Because Don was afraid of the TDB, he did not go to the TDB headquarters, but rather reported what had happened to the local police at the Colombo police headquarters, accompanied by his wife's brother-in-law, who was a policeman. On the advice of

friends, Don told the police that the cook had only worked for him for a short period of time, fearing that if he revealed that the cook had worked for him for several years, he would be in even more danger because the police might suspect that he, too, was affiliated with the LTTE. Don and his wife then went to stay at his sister's house, 125 miles away from his home. Despite the IJ's contrary finding, it can reasonably be inferred that both the LTTE and the TDB came to Don's home. Some "unknown" persons suspected to be affiliated with the LTTE stoned Don's house and hung around his restaurant. Meanwhile, neighbors reported that the TDB surrounded his house to arrest him, and then questioned his father about his whereabouts. Six months after the cook was arrested, Don obtained tourist visas from the United States Embassy and fled Sri Lanka.

At his March 12, 2002 hearing before the IJ, Don testified that in a previous interview with an asylum officer, he had not correctly remembered the date Moorthi was hired. Why would he? *Hiring* the cook was not a significant event among the series of events leading to his petition for asylum. Yet, the IJ seized upon the discrepancy between hiring dates told to the Sri Lankan police, the asylum officer, and the IJ, to find Don not credible:

> It seems to me a simple factor to state as to when it was that this man who was the source of him having to flee his country started to work for him. But for some reason he has not been able to be consistent with that particular fact. Therefore, I do not make a positive credibility finding for him . . . .

One can hardly imagine a "discrepanc[y]" that goes less to the heart of Don's asylum claim than this one. *Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir. 2004). "Minor inconsistencies that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996)

(citation and internal quotation marks omitted). While the substantial evidence standard is deferential, the IJ must point to a "specific and cogent" reason supporting an adverse credibility finding, *Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003), and "such reason must be substantial and bear a legitimate nexus to the finding," *Salaam v. INS*, 229 F.3d 1234, 1238 (9th Cir. 2000) (citation and internal quotation marks omitted). Moreover, "if [a] discrepanc[y] 'cannot be viewed as [an] attempt[ ] by the applicant to enhance his claims of persecution [it] ha[s] no bearing on credibility.' " *Chen v. INS*, 266 F.3d 1094, 1100 (9th Cir. 2001) (quoting *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)), *overruled on other grounds by* 537 U.S. 1016 (2002), *adverse credibility determination aff'd on remand*, 326 F.3d 1316 (9th Cir. 2003).

When compared to date inconsistencies that we previously have found inconsequential, the IJ's legal error in finding that the hiring date discrepancy went to the heart of Don's asylum claim is obvious. *See Zheng v. Ashcroft*, 397 F.3d 1139, 1147 (9th Cir. 2005) (as amended) (finding that discrepancy in date of forced abortion was a minor inconsistency)*; Wang v. Ashcroft*, 341 F.3d 1015, 1021-22 (9th Cir. 2003) (finding that a discrepancy regarding the date on which the petitioner's wife had received two forced abortions by the Chinese government was minor)*; Bandari v. INS*, 227 F.3d 1160, 1166 (9th Cir. 2000) (finding that a discrepancy in the date the petitioner was beaten and arrested by police for having an inter-faith relationship did not go to the heart of the petitioner's asylum claim); *Vilorio-Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988) (as amended) (holding that a discrepancy regarding the date on which the petitioners claimed they had been chased by a death squad was minor and could not serve as the basis for an adverse credibility determination); *Damaize-Job*, 787 F.2d at 1337 (finding that an inconsistency between the petitioner's oral testimony and his asylum application regarding the year in which his daughter was born was "trivial" and could not support an adverse credibility determination).

Here, the IJ failed to state why the hiring date inconsistency is relevant to Don's asylum claim or even whether it reveals anything about his fear for his safety. The hiring date of the cook had absolutely no significance to Don at the time it occurred. Don would have had no reason whatsoever to remember the hiring date, because the date only acquired any significance in the course of these asylum proceedings. Thus, it is clear that in making the adverse credibility finding, the IJ impermissibly "picked at minor memory lapses and inconsistencies on issues at the periphery of [petitioner's] asylum claim." *Shire v. Ashcroft*, 388 F.3d 1288, 1298 (9th Cir. 2004) (quoting *Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004)).

Even if the date discrepancy were material to Don's claim, "[a]n adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency," *Singh v. Gonzales*, 439 F.3d 1100, 1106 (9th Cir. 2006) (quoting *Kaur v. Ashcroft*, 379 F.3d at 887), or when the IJ fails to "address in a reasoned manner the explanations that [petitioner] offers for these perceived inconsistencies," *Osorio*, 99 F.3d at 933. *See also Guo v. Ashcroft*, 361 F.3d 1194, 1201 (9th Cir. 2004). The IJ failed to address Don's plausible explanation that he lied to police in Sri Lanka regarding the cook's hiring date because he was afraid for his life and he did not want the police to accuse him of being affiliated with the LTTE. The IJ mischaracterized Don's rationale for lying, finding out of thin air that "it was important to him and that his best interests were at stake."

The majority compounds the IJ's error by ignoring our circuit precedent that we do not look beyond the record, instead supplying its own speculative reasons for the IJ's insupportable finding. The majority first speculates that the hiring date is not trivial because Don's testimony is the only evidence in the record that the cook was in his employ at the time of the arrest. Maj. op. at 1621. The majority next questions the documentary evidence submitted by Don to corroborate his

account, and points out that the IJ in the March 12, 2002 hearing identified discrepancies in the business license issued for Don's restaurant. Maj. op. at 1621 n.7. Only the panel majority rests on these unsupported assumptions. *Neither* the government nor the IJ disputes that the cook was in fact employed by Don at his restaurant on the date the police arrested him, evidence which is also detailed in a contemporaneous newspaper account of the cook's arrest. Nor did the IJ rely on any alleged discrepancy in the business license as a basis for his decision. Quite the opposite: the IJ finds that "[i]n that year and in that month [January 2000] the respondent [Don] had a cook who worked in a restaurant owned by them and he was arrested and charged." The IJ also finds that Don is a businessman who "owns two businesses." Moreover, as the majority itself later discusses, the IJ admitted into evidence both the newspaper article and the business license.

The majority is simply wrong to make up reasons to support the IJ's credibility determination. Our review of an adverse credibility finding is limited to the actual reasons relied upon by the IJ in his decision. "[W]hen each of the IJ's or BIA's proffered reasons for an adverse credibility finding fails, we must accept a petitioner's testimony as credible." *Kaur v. Ashcroft*, 379 F.3d at 890; *see also Damaize-Job*, 787 F.2d at 1338 ("Because the IJ expressed no further concerns, and the only explicitly articulated reasons rested on impermissible factors, then we conclude from the IJ's opinion that [the petitioner] was an otherwise credible witness."). Nor does the majority explain satisfactorily why the hiring date bears a legitimate nexus to Don's asylum claim or how the discrepancy might in any manner enhance Don's claim of persecution.

To support its departure from clear precedent, the majority mistakenly relies on *Chebchoub v. INS*, 257 F.3d 1038 (9th Cir. 2001), and *Singh*, 439 F.3d 1100. Maj. op. at 1620-21. *Chebchoub*, however, is inapposite because there the petitioner's testimony about the events leading up to his departure *did*

go to the heart of his asylum claim. 257 F.3d at 1043. The inconsistencies at issue in *Chebchoub* — whether Chebchoub was arrested during a political demonstration, whether he joined a socialist opposition group during college, and whether he was active in various political groups — formed the basis for his claim of persecution on account of political opinion and imputed political opinion. *Id.* In addition, unlike the one inconsistency at issue here, the IJ in *Chebchoub* found a total of twenty-two inconsistencies. *Id.* at 1042.

The majority's reliance on *Singh*, 439 F.3d at 1108, is also misplaced given that in *Singh* we reversed the IJ's adverse credibility finding. In the passage quoted by the majority, maj. op. at 1621, we discussed whether the IJ's adverse credibility finding properly could be based upon Singh's inability to recall whether he transported Sikh demonstrators to political rallies many times, as he initially stated, or only once or twice, as he later testified. *Id.* at 1108-09. Although the transportation of the demonstrators was the event which led to Singh's arrest and beating by the Indian police, and we noted that it thus arguably went to the heart of his claim, we found that the "number of times Mr. Singh transported protestors reveals nothing about the events that caused him to fear for his safety." *Id.* at 1109. We reiterated that "an inconsistency about the number of times Mr. Singh transported protesters in the past in no way taints Mr. Singh's consistent testimony about the events that formed the heart of his asylum petition" and rejected it as a basis for the IJ's adverse credibility determination. *Id.*

The majority errs yet again when it characterizes the inconsistency in the hiring date of the cook as one piece in a pattern of pervasive dishonesty, reasoning that " 'when inconsistencies that weaken a claim for asylum are accompanied by other indications of dishonesty — such as a pattern of clear and pervasive inconsistency or contradiction — an adverse credibility determination may be supported by substantial evidence.' " Maj. op. at 1622 (quoting *Kaur v. Gonzales*, 418 F.3d 1061,

1067 (9th Cir. 2005)). This faulty logic allows the majority to go on to find Don's account comparable with that of the petitioner in *Kaur v. Gonzales*, a case in which the circumstances could not be more dissimilar to those existing here. 418 F.3d at 1067. In *Kaur,* the petitioner completely changed both the details and the key events which formed the heart of her asylum claim, including retracting her claim that she had been raped at the hands of the Punjabi police. *Id.* at 1063, 1067. In addition, Kaur admitted to the IJ that she knowingly lied to an INS officer, in particular stating that she was not married, for the express purpose of ensuring that her husband could file an asylum application if hers was denied. *Id.* at 1066-67. Because we correctly found that these numerous and pervasive inconsistencies went to the heart of Kaur's claim and could not be categorized as minor, we upheld the adverse credibility finding. *Id.* at 1067.

Unlike in *Kaur v. Gonzales*, however, "other indications of dishonesty" do not abound in Don's account and are not "so numerous and so blatant as to cast doubt on [his] entire story." *Id.* at 1066. Because the hiring date of the cook is a minor inconsistency for which Don offered a plausible explanation, it cannot bear the weight of the IJ's adverse credibility finding.

## B. Propensity for Not Telling the Truth

The IJ states that Don "had a propensity for not telling the truth," but fails to articulate any fact to undergird this finding. The IJ's opinion only identifies two bases for this "propensity." First, the hiring date inconsistency, and second, an alleged "lie" to the LTTE that he would try to get the cook released. The IJ described Don's response to the LTTE as Don "tr[ying] to predicate [sic] the LTTE by telling them he'd cooperate and apparently he didn't except to talk to some of his friends in the force but he didn't do what he had really set out to do." The IJ's assertion has no basis in the record, nor in our case law.

The IJ simply got the facts wrong. A review of the record reveals that Don did not lie to the LTTE when he stated that he would attempt to secure the cook's release. Don testified that he actually tried to seek help from his friends in the local police to get the cook released:

> Q:   Did you talk to anyone regarding freeing Mosi from the police?
>
> A:   I — I asked for my friends to release Mosi from the police.
>
> Q:   Which friends?
>
> A:   Friends who worked in the police, those people. When this happened I told this to my friends. I told them if I can (indiscernible) from the police. I don't have any — (indiscernible) problem with the LTTE. That's kind [sic] of help I ask from my friends.
>
> Q:   What did they say to you?
>
> A:   The first time they said they would look into that. The next time they said they cannot do it because (indiscernible) and there are some more people.

Don had an obvious incentive to do so — if he could secure the cook's release, perhaps the LTTE would not carry out its threat to kill Don and his family. In response to the IJ's question during the March 12, 2002 hearing asking whether Don lied to the police and the LTTE because it would benefit him, Don explicitly denied lying to the LTTE, stating "I didn't lie to the LTTE. What I thought was if I take Mosi [the cook] out from [sic] the police, that's (indiscernible) from the problems I had with LTTE."

Don's telling the police that the cook had just started working for him and his promising the LTTE that he would try to

secure the cook's release were acts performed to avoid further persecution and facilitate escape from Sri Lanka. Don's behavior is fully consistent with his claim of asylum. The LTTE is a known violent terrorist organization which repeatedly threatened his life. Who wouldn't promise a fierce and powerful terrorist group whatever they demanded if one's life were threatened? And then having failed to deliver what had been promised, who wouldn't attempt to flee?

The majority erroneously accepts the IJ's "propensity for dishonesty" determination at face value, neglecting its duty to review the record to determine whether the IJ's characterization is supported by any evidence. The majority instead looks to *Kaur v. Gonzales* for support. 418 F.3d at 1065-67. *Kaur v. Gonzales*, however, is inapposite, as the petitioner there admitted that the reason she lied about her marital status and her rape by the Punjabi police was specifically to enhance her chances of obtaining asylum. *Id.* By contrast, there is no suggestion here that Don lied to establish an element of his asylum claim or to enhance his chances; to the contrary, Don lied to the police to minimize his affiliation with a suspected terrorist and escape persecution by the TDB. Furthermore, Don did not lie to the LTTE, but rather truthfully told them he would try to free Moorthi. The fact that Don was unable to deliver upon his promise to terrorists who were threatening his life does not in any way support a finding that he has a "propensity for dishonesty."

## C.   Implausibility of Persecution by the LTTE and the TDB

The IJ created a fantastical scenario in which he likened the working relationship between the Sri Lankan local police and the TDB to that of the local police in the United States with the FBI. He speculated that Don's ties to the local police would erase any problems he had with the TDB, and assumed that the local police and the TDB would competently and judiciously investigate whether there was a terrorist in their

midst. These findings are grounded on quicksand — factual inaccuracies and speculation — rendering them wholly lacking in support.

The IJ first speculated that the TDB and the local police in Sri Lanka had a close working relationship:

> The respondent was visited by the TDB and he happened not to be home. They asked to speak to him twice which frankly seemed reasonable to me since they dealt with terrorists and they had one in their midst. The irony with [sic] this is that the respondent's wife, who is in a family of police officers, apparently they have no problems with the TDB. Apparently, it would be the same as the local police and the FBI. However, I would think that the FBI would listen to the local police.

The IJ next surmised that because on American television those with ties to the police can easily resolve legal difficulties, Don should have been able to clear up any problems:

> Assuming everything this man says is true, this seems to be one of those situations that one sees on television where one thinks that if they sit down at a table and talk about, [sic] it they can get it straightened out. This respondent must have some credibility as a businessman in his town. With police friends and so forth I think they could easily ascertain that he had not had ties to the Tamel [sic].[3]

---

[3] I cannot even imagine to which television shows the IJ is referring. In one of the most highly-rated series on television, *24*, Jack Bauer, a federal agent at the Counter Terrorism Unit, located in Los Angeles, has *never* once had the opportunity to "sit down at a table" and "straighten it out" at any time during its past five seasons. Perhaps the IJ was imagining an idealistic world that exists only in his own mind — but that would be speculation, and my dissent does not depend on that.

Sympathizing with the plight of the TDB in not being able to question Don and completely disregarding the evidence in the record documenting the Sri Lankan security forces's penchant for brutal interrogation methods and extrajudicial killings, *see infra*, the IJ then noted:

> [T]he police would certainly have, as I said, an active duty to investigate when there is a terrorist in their midst. That is if this man is, in fact, a terrorist which on [sic] one has proven, then the police certainly need to know as much about him as they can. I see no credible evidence or documentation to prove that these people on behalf of the government would harm the respondent in any way.

The IJ then opined that Don's fear of an extremely violent terrorist organization was misplaced: "I do not see how it is that based on the fact that this man was arrested in his restaurant and was his employee why it is that they would persecute him. If they did, I would concede that the government probably would do nothing about it." The IJ concluded his run of wild speculation with the conjecture that because Don filed police reports with the police, the police "should have been aware that he was trying to cooperate with them from the start."

The IJ posited a world that may exist, if at all, only on American television, not in reality, one in which the local police consistently work effectively with the FBI (and vice-versa) and that prominent Sri Lankans who have nothing to hide can just sit down and "work things out" with the police. There is absolutely no evidence in the record that support's the IJ's preposterous assertions, much less the requisite "substantial evidence." The evidence in the record only corroborates Don's account. The United States Department of State's Country Report on Human Rights Practices in Sri Lanka (Feb. 2001) ("Country Report"), submitted as part of the administrative record, corroborates Don's testimony that security

forces,[4] like the TDB, often operate independently of other government entities and commit serious human rights abuses. Don's testimony confirms that the TDB and the local police do not work in concert; Don testified that he had gone to the Sri Lankan police headquarters on several occasions and that despite having told the local police that the TDB was looking for him, he was not once held for questioning or told to report to the TDB. Don also testified that he was rebuffed by his wife's brother-in-law, who worked for the local police, when he asked for assistance with the TDB: "He said he cannot get involved with the TDB because the people who work for [sic] are elected by the president of Sri Lanka." Don repeatedly emphasized that he was afraid of the TDB despite his family connections with the local Sri Lankan police.

Furthermore, the evidence demonstrates that Don had good reason to fear the TDB. Don testified that the TDB had killed prisoners in the past: "They killed people and they put them — the dead bodies on the light poles. The (indiscernible) put the pictures everywhere of how they did [sic] the people. They're (indiscernible) [sic] Sri Lanka [sic] if you go to TDB,

---

[4]According to the Country Report, Sri Lankan security forces consist of both police and the armed forces.

> The 60,000-member police force is responsible for internal security in most areas of the country, and it also has been used in military operations against the LTTE. The 120,000-member army (which includes the Army Volunteer Force), the 17,000-member navy, and the 18,500-member air force bear principal responsibility for conducting operations against the LTTE insurgents. The police paramilitary Special Task Force (STF) also battles the LTTE. The more than 15,000-member Home Guards, an armed force drawn from local communities and responsible to the police, provides security for Muslim and Sinhalese village communities in or near the war zone. The government also arms and appears to direct various anti-LTTE Tamil militias, although at times these groups seemed to act independently of government authority.

Country Report pmbl.

you're not going to come back again." The Country Report corroborates Don's account. It states that Sri Lankan security forces have broad powers to arrest and detain people without charge or judicial review, and that the Sri Lankan Emergency Regulations, in force nationwide since August 1998, permit "pretrial detention for a maximum of four consecutive 3-month periods." Country Report § 1 pt. d. Furthermore, the Country Report verifies that security forces have been responsible for many extrajudicial killings and disappearances:

> Police, Home Guards, and army personnel committed extrajudicial killings, including the killing of civilians in connection with the conflict of the LTTE. . . . Impunity remains a serious problem. Since April 1995 at least several hundred persons have been killed extrajudicially by the security forces or have disappeared after being taken into security force custody; they are presumed dead.

Country Report § 1, pt. a. The Country Report substantiates Don's fear of "disappearing" should he have been at home when the TDB arrived; regional commissions set up in November 1994 to investigate disappearances that occurred from 1988-1994 found that "16,742 persons disappeared after having been removed involuntarily from their homes, in most cases by security forces." *Id.* § 1, pt. b. Finally, the Country Report documents widespread use of torture by the security forces and police:

> Despite legal prohibitions, the security forces and police continue to torture and mistreat persons in police custody and prisons, particularly Tamils suspected of supporting the LTTE. . . . [T]orture continues with relative impunity. In addition, the [Sri Lankan Prevention of Terrorism Act] makes confessions obtained under any circumstance, including by torture, admissible in court. . . . Members of the security forces continued to torture and mistreat

detainees and other prisoners, particularly during interrogation.

*Id.* § 1, pt. c. The methods of torture employed by the security forces are barbarous and belie the IJ's notion that Don had nothing to fear from the government forces: "electric shock, beatings (especially on the soles of the feet), suspension by the wrists or feet in contorted positions, burning, slamming testicles in desk drawers, [ ] near drownings," remaining in "unnatural positions for extended periods," and placing "bags laced with insecticide, chili powder, or gasoline [ ] over [the] head[ ]." *Id.*

The record likewise reveals just how ludicrous the IJ's supposition is that Don should have nothing to fear from the LTTE. Don's wife described the threats the LTTE made over the telephone: "[T]hey were telling my husband to let them know that LTTE is a very strong terrorist group and they can kill everybody in your family." The Home Office of the United Kingdom's Sri Lanka Assessment (Apr. 2001) ("Assessment") further corroborates Don's account, detailing the grisly reprisal methods employed by the LTTE:

> deliberate and arbitrary killings of Sinhalese civilians; summary executions of Tamils considered to be "traitors"; torture and ill treatment of prisoners;
>
> . . .
>
> people being forced to provide guerrillas with food and money; routinely violating the civil liberties of the people in the areas of Sri Lanka which they control, operating an unfair court system, and discriminating against ethnic and religious minorities; use of excessive force in the war. The LTTE kill non-combatants, and are responsible for disappearances and detentions.

Assessment ¶ 5.2.86. The Country Report also documents widespread use of torture by the LTTE: "The LTTE reportedly used torture on a routine basis. Security force prisoners released by the LTTE stated that they had been subjected to torture, including being hung upside down and beaten, having pins inserted under their fingernails, and being burned by hot rods." Country Report § 1, pt. c.

All of this evidence is contained in the administrative record. It compels a finding that Don's account of simultaneous persecution by the LTTE and the TDB and fear of being tortured and killed by one or the other is credible. The IJ should have considered this record evidence, but did not, to determine the plausibility of Don's account, rather than relying on his perceptions of American network television to inform himself of conditions at home or abroad. Although an "IJ's comments regarding 'implausibility' are treated as grounds for an adverse credibility finding," it is only a proper basis if the IJ's "logical inferences are supported by substantial evidence." *Singh*, 439 F.3d at 1110 (citations omitted).

Even if the record did not completely undermine the IJ's conjecture, his "findings" are little more than idle musings. We have consistently stated that personal conjecture about what persecutors would or would not do is speculation and not a substitute for substantial evidence.[5] Second, we have repeatedly held that speculation and conjecture about the workings of foreign authorities and governmental bodies cannot support an adverse credibility finding.[6] In a similar case,

---

[5]*See, e.g., Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996) ("personal conjecture about what guerillas likely would and would not do" is not sufficient); *Del Valle v. INS*, 776 F.2d 1407, 1413 (9th Cir. 1985) ("[T]he BIA's conclusion that the security forces released Del Valle because they were satisfied that he was not part of the opposition is not based on substantial evidence, but upon conjecture.").

[6]*See, e.g., Singh,* 439 F.3d at 1108 (speculation about what types of questions the IJ believed Indian officials would ask of suspected Sikh sep-

*Akinmade v. INS*, 196 F.3d 951, 957 (9th Cir. 1999), we concluded that the IJ's finding regarding whether petitioner's father, as a member of the middle class, had influence in the military government and could therefore protect him, was speculation insufficient to support an adverse credibility finding. *Id*. Finally, we have held that reliance on speculation about a petitioner's fear of his persecutors and how he might react in response to that fear is specious.[7]

---

aratist during beating was impermissible ground); *Kaur v. Ashcroft*, 379 F.3d at 887-88 ("personal conjecture about the manner in which Indian passport officials carry out their duties" and how an applicant would describe an event is impermissible basis); *Ge v. Ashcroft*, 367 F.3d 1121, 1125 (9th Cir. 2004) (personal conjecture about what the Chinese authorities would or would not do in a given situation is impermissible basis); *Arulampalam v. Ashcroft*, 353 F.3d 679, 687-88 (9th Cir. 2003) (IJ's hypotheses regarding abilities of Sri Lankan soldiers and police and official registration requirements is impermissible basis); *Wang v. INS*, 352 F.3d 1250, 1255-56 (9th Cir. 2003) (speculation regarding China's use of force against demonstrators and enforcement of one-child policy is impermissible basis); *Singh v. INS*, 292 F.3d 1017, 1024 (9th Cir. 2002) (assumption regarding Indian police motives is impermissible basis); *Gui*, 280 F.3d at 1226-27 (IJ's opinion "as to how best to silence a dissident" and that "the Romanian government must not be repressive because it merely harassed and threatened but did not kill" petitioner, is impermissible basis); *Chouchkov v. INS*, 220 F.3d 1077, 1083 (9th Cir. 2000) (personal conjecture about expected efficiency and competence of government officials is impermissible basis); *Shah v. INS*, 220 F.3d 1062, 1069, 1071 (9th Cir. 2000) (State Department conjecture about the effect electoral victory would have on existing political persecution, BIA's belief about what a letter should look like, and how many the applicant should have received is impermissible basis).

[7]*See, e.g., Guo*, 361 F.3d at 1201-02 (speculation as to why Guo did not apply for asylum immediately upon entry is impermissible ground for adverse credibility determination); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002) (IJ's hypothesis as to what motivated the applicant's departure from Sri Lanka does not support adverse credibility finding); *Bandari*, 227 F.3d at 1167-68 ("IJ's subjective view of what a persecuted person would include in his asylum application," personal belief that applicant should have bled when he was flogged, and speculation about a foreign government's educational policies are impermissible grounds).

The majority fares no better than the IJ in confounding the local Sri Lankan police with the TDB. The majority asserts that "Don contacted friends who could influence the TDB to release the cook, and spoke to the TDB by telephone, describing filed police reports addressing the LTTE threats." Maj. op. at 1623. Nothing in the record supports the statement that Don had friends who could influence the *TDB* or that he referenced or described in a detailed manner the police reports filed with the Colombo and Padukka police departments to the TDB. In fact, the record compels the contrary conclusion. The exchange between the Immigration Service attorney and Don was as follows:

> Q.  Sir, you stated that the TDB — is it true that you believe that the TDB thinks that you aided the terrorists?
>
> A.  Yes.
>
> Q.  But you never used the police report that you submitted to the Court to show your innocence to the TDB, did you?
>
> A.  I just — I just talked to the TDB over the phone and I told them.
>
> Q.  But you never showed them or referenced them to any of the police reports you made indicating that you did not (indiscernible)?
>
> A.  My friends told me don't go to the TDB. That's why I called them and — and I told them I made the police reports with the — about the LTTE (indiscernible).

The majority engages in the same speculation as the IJ about the relationship between the TDB and the local police when it postulates that "it is implausible that [Don] would

bring attention to himself by telling the police in Colombo that he feared the TDB because the TDB was looking for him." Maj. op. at 1623. This finding of implausibility is without logic, much less record support. The record is clear that Don went to the local police, but feared contact with the TDB given the severe human rights abuses committed by Sri Lankan security forces, which are well-documented in the Country Reports contained in the record. Thus, the majority erroneously finds the IJ's conclusion that Don's account is implausible, a finding permeated with impermissible speculation and conjecture, is supported by substantial evidence. *See Chen*, 362 F.3d at 621 (a "general conclusion" that the petitioner's testimony, taken as a whole, is not credible cannot be a basis for an adverse credibility finding because it "amounts to no more than speculation and conjecture once we reverse each of the IJ's credibility findings").

## CONCLUSION

Because the IJ's adverse credibility determination rested on insufficient and impermissible grounds, we must deem Don credible. *See Akinmade*, 196 F.3d at 957-58 ("We conclude that the BIA's credibility determination rested on insufficient and impermissible grounds. As in other similar cases, under these circumstances, we deem the petitioner's testimony credible."). I would therefore reverse the BIA's adverse credibility determination and remand to the BIA for a determination of Don's eligibility for asylum.