**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0391n.06

**No. 09-3417**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
**Jun 29, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MOHAMMAD TAGI SALEM NABHANI, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW OF AN |
| v. | ) | ORDER OF THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before:  BOGGS, ROGERS, and COOK, Circuit Judges.

COOK, Circuit Judge.  Mohammad Tagi Salem Nabhani, a native and citizen of Iran, petitions for review of the Board of Immigration Appeals (BIA)'s order affirming the Immigration Judge (IJ)'s denial of his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT).  We deny Nabhani's petition.

I.

Nabhani entered the United States on an unknown date and, in March 2003, filed an affirmative application for asylum, withholding of removal, and CAT protection.  Thereafter, the Department of Homeland Security served Nabhani with a notice to appear, charging him with removability under 8 U.S.C. § 1182(a)(6)(A)(i) as an alien present in the United States without being admitted or paroled.

Nabhani asserts that the Sepah Pasdaran, also known as the Army of the Guardians of the Islamic Revolution, persecuted him and his family on account of their Arabic ethnicity and political opinion. His father, Salem Nabhani, belonged to a group that promoted the liberation of Arabs living in Iran. In 1987, members of the Sepah Pasdaran came to the family's home and forcibly removed Salem. A few months later, Nabhani learned of his father's execution.

After his father's death, the harassment continued. Nabhani testified that from 1987 until 1990, when he left Iran at the age of fourteen, he suffered abuse and imprisonment at the hands of the Sepah Pasdaran. Although Nabhani recalled reporting to the Sepah Pasdaran station "fifty times" or "[m]aybe more" each week during that time period, he specifically recounted only two visits to the station when officers imprisoned and tortured him.

On one occasion, officers imprisoned Nabhani for refusing to declare support for Ayatollah Khomeini. They detained Nabhani for one month, during which they tortured, beat, and cursed at him on a daily basis. In addition, his captors urged him to sign a document stating that he would not participate in any political activities and that he would pledge allegiance to Khomeini and join the Basij Army, an auxiliary military unit of the Revolutionary Guards primarily comprised of those too young or too old for regular conscription.

Nabhani also related the circumstances of a second imprisonment. At the end of 1989 or beginning of 1990, the Sepah Pasdaran summoned him and his mother to the station. The officers asked his mother questions about his brothers, cursed her, and pushed her. When they pulled on his

mother's traditional clothing, Nabhani defended her.  The guards then took him into custody.  As with his last detention, they beat Nabhani and questioned him regarding his loyalty to Khomeini.

Nabhani's second detention lasted approximately fifty days.  During the first days of his detention, Nabhani grasped a guard's hands in an attempt to protect himself from being hit.  The guard retaliated by cutting him above his right hip.  Nabhani testified that he bled for the remainder of his detention.

In contrast to his testimony at the hearing, Nabhani's written statement asserts that his second arrest came about "[d]ue to [his] quarrels and arguments with the Persian students [at his school]."  This written account states that authorities accused him of belonging to one of the opposition parties and that his detention led to right-shoulder and right-ear injuries.  The statement also provides a different variation of the knife incident, assigning its occurrence to "the last days of torture" and alleging that the guard "threw the knife at [him]," wounding his right thigh, after which he was released.

Following his release from this second detention, Nabhani spent time in Germany.  But after the German government denied his application for refugee status, he used a false name and fraudulent document to gain admission to Canada.  Although Nabhani initially told Canadian immigration authorities that he had arrived from Iran via Amsterdam and sought asylum because the Iranian government suspected Arab involvement in the killing of police officers, he later changed his story to resemble the one here.  Nabhani's two-year stint in Canada ended when his cousin

allegedly withdrew support of his asylum application. He then arranged to join one of his brothers in the Netherlands by way of smugglers in Mexico. Using a false Canadian passport, Nabhani flew to Mexico and stayed there for ten months. When Nabhani could not meet the smugglers' demand for more money, they took him to the United States.

Nabhani claims that he fears returning to Iran because there is an execution order against him. His mother informed him of the order while he was in Germany. According to Nabhani, the order has since been dismissed and reinstated. Nabhani failed to include the execution order in either of his asylum applications, however, even though the alleged death sentence existed during those years.

Finding Nabhani's testimony not credible, the IJ denied his requests for relief. The IJ rested her adverse-credibility determination on internal inconsistencies and implausibilities in Nabhani's testimony, and the omission of key events and details of his alleged claim of persecution. Even assuming Nabhani's credibility, the IJ held that the asylum and withholding-of-removal claims failed due to his firm resettlement in Germany. Specifically addressing Nabhani's claim for CAT protection, the IJ found his reliance solely upon country-condition information insufficient to establish eligibility. Accordingly, the judge ordered him removed to Iran.

In a decision issued by a single Board member, the BIA dismissed Nabhani's appeal. The Board accepted the IJ's adverse-credibility determination as supported by the record. And because the adverse-credibility determination controlled the disposition of Nabhani's requests for asylum and withholding of removal, the BIA expressly declined to discuss the "remainder of [Nabhani's]

arguments on appeal regarding those two forms of relief." The Board also cited Nabhani's lack of credibility in affirming the IJ's denial of CAT relief, but then "separately concluded that general reports of country conditions contained in the record were insufficient to merit a grant of protection."

## II.

Nabhani first challenges the IJ's adverse-credibility determination. We review factual findings, including credibility determinations, for substantial evidence. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). Under the deferential substantial-evidence standard, we deem the IJ's findings "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Because Nabhani's asylum application preceded the enactment of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, the IJ's adverse-credibility determination "must be supported by specific reasons" and "must be based on issues that go to the heart of the applicant's claim." *Liti v. Gonzales*, 411 F.3d 631, 637 (6th Cir. 2005) (internal quotation marks and citation omitted). Discrepancies have no bearing on an applicant's credibility unless they serve to enhance his claim of persecution. *Sarr v. Gonzales*, 485 F.3d 354, 360 (6th Cir. 2007).

The IJ catalogued inconsistencies, omissions, and implausibilities in Nabhani's testimony to support her adverse-credibility finding. Although Nabhani correctly notes that some of the IJ's discrepancies do not go to the heart of his claim, others do. *See Vasha v. Gonzales*, 410 F.3d 863, 870–72 (6th Cir. 2005) (where IJ cites inconsistencies going to heart of the claim, additional citation to immaterial inconsistencies or speculation does not undermine credibility ruling). Thus, the record

evidence does not compel a contrary credibility conclusion.

Several specific examples lend support to the IJ's adverse-credibility determination. First, Nabhani testified inconsistently with his written application regarding his second imprisonment in several respects: the year of the arrest; whether the arrest occurred after an incident at school or after police summoned Nabhani and his mother to the station; and the timing and circumstances of the stabbing. Highlighting his age at the time of the alleged persecution, Nabhani contends that the IJ and BIA should have applied the INS's "Guidelines for Children's Asylum Claims" when evaluating his testimony and deciding the issue of credibility. Although courts may consider an applicant's age at the time of the alleged past persecution when assessing the impact of the harm suffered, *see Abay v. Ashcroft* 368 F.3d 634, 640 (6th Cir. 2004), persecution during youth cannot excuse an adult's unexplained inconsistencies and embellishments. To hold otherwise would risk depriving IJs of the ability to make adverse-credibility determinations in cases where the applicant was allegedly prosecuted as a child.

Second, neither of Nabhani's two written applications included mention of an execution order that he testified to before the IJ. When questioned by the IJ about this omission, Nabhani could not satisfactorily explain it. "Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim." *Liti*, 411 F.3d at 637. Because Nabhani's fear of persecution in Iran rests in large part on the execution order, the IJ correctly recognized the significance of this omission.

Finally, Nabhani implausibly testified that officers brought him to the police station at least fifty times every week for over two years. On appeal, Nabhani's counsel argues against a literal interpretation of this number, insisting that Nabhani's usage was "colloquial or hyperbolic in nature." But, as the Attorney General highlights, the IJ provided Nabhani with several opportunities to correct the number or explain his testimony, and he failed to do so. Moreover, Nabhani's counsel never sought to clarify his client's use of the number. Together, these three examples constitute "specific, cogent reasons" going to the heart of Nabhani's claim. *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007) (internal quotation marks and citation omitted).

Evidence of Nabhani's dishonesty and his failure to provide corroborative evidence further reinforce the IJ's credibility determination. Nabhani admittedly used false documents and a false name to enter Canada and Mexico and submitted a false asylum claim to Canadian immigration authorities. *See id*. at 742 n.5 ("Admission of prior dishonesty can support an adverse credibility determination."). In fact, Nabhani initially provided Canadian Immigration officials with an entirely different basis for his fear of returning to Iran than the one he presented to the IJ. And although Nabhani testified that he had weekly contact with his family in Iran and asked them to supply statements and letters, he tendered no corroborative statements from those family members. These defects, as with Nabhani's failure to mention the alleged execution order in his written applications, relate to conduct that occurred while Nabhani was an adult.

Nabhani's inconsistent accounts of his second arrest, omission of the execution order, and exaggeration of the number of times police called him to the station, in conjunction with other

evidence of his dishonesty and failure to provide corroborating evidence, convince us that a reasonable adjudicator would not be compelled to find Nabhani credible. Accordingly, his claims for asylum and withholding of removal fail.

III.

Nabhani also contends that the BIA erred "in allowing an adverse-credibility finding and a denial of relief under an asylum claim to preclude the granting of withholding under CAT." But the Board's denial of CAT protection did not rest solely on adverse credibility. Rather, the Board separately found the general reports of country conditions in the record insufficient to merit relief. Because Nabhani points to no other evidence that the Board ought to have considered in making its CAT determination, and because substantial evidence supports the adverse-credibility ruling, this claim too fails.

IV.

Finally, Nabhani challenges the Board's decision to adjudicate his appeal by a single-member—rather than a three-member—panel. A panel of Board members initially screens appealed decisions for assignment to a single-member or three-member panel. 8 C.F.R. §§ 1003.1(a)(3), 1003.1(e)(1). If assigned to a single board member, that member may refer the case to a three-member panel if the case presents one of the circumstances enumerated in 8 C.F.R. § 1003.1(e)(6). The circuits are split as to whether courts have jurisdiction to review the discretionary determination of the Board to deny three-member review. *Compare Quinteros-Mendoza v. Holder*, 556 F.3d 159,

161–62 (4th Cir. 2009) (finding jurisdiction to review BIA streamlining decisions), *Purveegiin v. Gonzales*, 448 F.3d 684, 691–92 (3d Cir. 2006) (same), *Chong Shin Chen v. Ashcroft*, 378 F.3d 1081, 1087–88 (9th Cir. 2004) (same), and *Batalova v. Ashcroft*, 355 F.3d 1246, 1252–53 (10th Cir. 2004) (same), *with Guyadin v. Gonzales*, 449 F.3d 465, 469–70 (2d Cir. 2006) (finding no jurisdiction over such decisions), and *Bropleh v. Gonzales*, 428 F.3d 772, 779 (8th Cir. 2005) (same).

Whether an applicant may challenge the BIA's decision to streamline his case pursuant to the Administrative Procedure Act remains an open question before this court. *Balliu v. Gonzales*, 192 F. App'x 427, 435 (6th Cir. 2006). Nabhani contends that the Board violated its review scheme because (1) his case presents a need for new precedent regarding the credibility standards applicable to asylum applicants who experience persecution as children, § 1003.1(e)(6)(ii), and (2) the Board rendered a clearly erroneous credibility finding, §1003.1(e)(6)(v). Assuming, without deciding, that we have jurisdiction, neither argument succeeds.

Under Section 1003.1(e)(6)(ii), a case may be heard by a three-member panel if it presents "the *need* to establish a precedent construing the meaning of [a] law[], regulation[] or procedure[]." *Id*. (emphasis added); *see also Quinteros-Mendoza*, 556 F.3d at 163 ("we can readily review whether there exists a need to establish a precedent construing the meaning of laws, regulations, or procedures") (internal quotation marks and citation omitted). Nabhani fails to establish that need here. While it is true that immigration judges should consider the age of a child applicant when assessing whether he or she suffered persecution or legitimately fears future persecution, *see Abay*, 368 F.3d at 640, no law, regulation, or procedure advises immigration judges to adjust the credibility

standard for adults who suffered persecution as children. Indeed, existing regulations afford applicants like Nabhani the opportunity to present affirmative evidence to ameliorate or explain any weaknesses in testimony resulting from the lapse of time since the alleged persecution. In light of sufficient precedent governing the evaluation of an applicant's credibility, even assuming jurisdiction, Nabhani's claim fails to trigger three-panel review under § 1003.1(e)(6).

The second reason Nabhani advances as to why his case requires three-member review—that the IJ made a clearly erroneous factual determination—also fails. Assuming jurisdiction, Nabhani would lose this challenge because, as noted in section II, substantial evidence supports the IJ's credibility determination. *See Balliu*, 192 F. App'x at 435.

V.

For these reasons, we deny Nabhani's petition.