Oscar Ricardo
**ZAYAS–MARINI, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 85–7233.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 17, 1986.

Decided March 25, 1986.

Martin Resendez Guajardo, San Francisco, Cal., for petitioner.

Mark C. Walters, Dept. of Justice, Washington, D.C., for respondent.

Before POOLE and BEEZER, Circuit Judges, and JAMESON, District Judge.*

JAMESON, Senior District Judge:

Oscar Ricardo Zayas-Marini (Marini) has petitioned for review of an order of the Board of Immigration Appeals (the Board) dismissing an appeal from a decision of an immigration judge finding Marini deportable, and denying his application for asylum and withholding of deportation, under sections 208 and 243(h) of the Immigration and Naturalization Act (Act), 8 U.S.C. §§ 1158 and 1253(h). We deny the petition for review.

## I. *Background*

On February 16, 1984, the Immigration and Naturalization Service (INS) charged Marini with entry without inspection under section 241(a)(2) of the Act, 8 U.S.C. § 1251(a)(2).[1] Deportation proceedings began February 28, 1984, but were continued to allow Marini to apply for political asylum and withholding of deportation. The proceedings resumed December 26, 1984. Following a two day hearing, the immigration judge held Marini deportable as charged.[2] Marini then appealed to the Board of Immigration Appeals, which in turn dismissed his appeal on April 23, 1985.

Marini testified at length at the hearing, but offered no corroborating evidence. Both the immigration judge and the Board for the purpose of their decisions assumed the truth of Marini's testimony.[3] This court, likewise, assumes its truth.

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. On October 12, 1982, Marini was denied entry to the United States at the Canadian border on the ground that he was living permanently in the United States, but had only a visitor's business visa. Later Marini entered the United States by taxi.

2. The INS took Marini into custody on December 9, 1984, as a result of the immigration judge's refusal to set bond. Marini has since been released, after spending approximately nine months in jail.

3. The immigration judge, however, found Marini's testimony to be "inconsistent, equivocal, wholly uncorroborated, and at times simply unbelievable."

Marini, a member of a prominent political family, was born in Paraguay on January 9, 1947. Marini's father had assisted Alfredo Stroessner in his political struggle for the presidency of Paraguay in the early 1950's.[4] Marini's family has since maintained close ties with President Stroessner, and other members of the Paraguayan government.[5] Marini fears two Paraguayan officials within the Stroessner government—Pastor Coronel, Chief of Investigations in control of a paramilitary police unit, and Ramirez Patino, Director General of the Water Treatment Program.

Marini began his political involvement at an early age. In high school he led a "section" of the Colorado Party, the ruling political party. Marini joined the military at age sixteen, and upon college graduation, Stroessner appointed him a "major." During this time, Marini allied himself with the right-wing extremist faction of the Colorado Party, the Guion Rojo, a faction not favored by Stroessner. Marini distinguished the two factions by noting the Guion Rojo gives to the people; it does not take from them. Marini testified that he approved of Stroessner's government for about ten years and then began to oppose it. During the 1960's, he personally argued with Stroessner over the government's policies.

In 1972, during his military service, Marini participated in an unsuccessful attempt to assassinate Stroessner at a "fort" where Marini was stationed. Marini's uncle, General Cabello, led the revolt, in which 60 people were killed. The soldiers controlled the fort for 35 days, and thereafter most fled to Argentina. Marini hid at his parents' ranch home and then fled to Europe.

Marini returned to Paraguay in 1973 for a brief stay. Again fearing for his safety,

he fled to his grandmother's home in Italy. Thereafter he located in the United States, first working as a gas station attendant and then working for himself as a trader with the People's Republic of China.[6] His family similarly traded with China from Paraguay. Marini travelled extensively during this time under a Paraguayan passport.[7] He obtained visas to visit Korea, Taiwan, Japan and China.

In 1979 Marini again returned to Paraguay to assist his father, after Pastor Coronel confiscated part of the Marini family business. Upon his arrival at the airport in Paraguay, police arrested Marini and jailed him for 31 days. The government released Marini when it was announced that he would marry the daughter of Colonel Myers, President Stroessner's Chief of Security. Pastor Coronel approached Marini on his wedding day. He asked Marini to become involved in a scheme to smuggle coffee beans. Marini refused. He remained in Colonel Myer's home for about two months after his marriage. Police came to the home brandishing weapons, but Colonel Myers' men warded them off. Because he no longer felt safe Marini left Paraguay for the United States. The marriage was annulled. However, Marini and his father-in-law remain on good terms.

While he was in Paraguay, police arrested Marini approximately 30 times, usually for curfew violations or illegal assembly. The military held Marini in 1969 for 20 days, in 1971 for two months, in 1975 or 1976 for 45 days, and finally in 1979 or 1980 for 31 days. The military never brought charges, but only questioned Marini concerning his political activities. There is no indication of physical violence during the detentions.

4. Marini testified that President Stroessner is currently very ill. Two contenders remain as possible successors to the president—Pastor Coronel, who threatened to kill Marini, and General Rodriguez, Marini's friend and ally.

5. Recently members of Marini's family have been ousted from political positions they have held. Marini's brother, until four years ago, had been president of a section of the Colorado

party. His uncle, General Leodegar Cabello, is currently in jail. Other members of his family continue to operate a pharmaceutical laboratory.

6. Marini earned $650,000 in 1980 as a trader.

7. Marini has consistently travelled under the protection of a Paraguayan passport.

Even after relocating to the United States Marini maintained associations with Paraguayan officials. In 1980 the Paraguayan government offered him the New York consulate position, but Marini turned it down because it offered an inadequate salary. Marini also attended the Panama Canal ceremonies with President Stroessner. Sometime prior to 1982, the Paraguayan government sent Marini to England to obtain a loan for Paraguay's water system. Marini also stayed with his old professor and good friend, the Ambassador of Paraguay, in Washington, D.C., in 1982.

During his stay with the Ambassador, Marini learned that Ramirez Patino had embezzled part of the loan funds for the water project. When the two men had occasion to meet at the Kennedy Center, Marini accused Patino of embezzlement. A fist fight ensued and Patino brought charges against Marini.[8]

Marini has remained in telephone contact with family and officials in Paraguay, as evidenced by phone bills of $6,000 to $7,000 per month. Marini's mother and father are now dead, but his brother and sister still live in Paraguay. His brother continues to operate the family business. His sister is a nun. Police have detained and interrogated Marini's brother following each phone conversation between the two men.

Marini has been warned by several people not to return to Paraguay. His brother and sister have told him to stay in the United States.[9] General Andres Rodriguez, the commander of the cavalry, ad- monished Marini that it would be better to kill himself than to return home. Marini's father-in-law warned him not to return even under the protection of a "godfather."

Upon reviewing the evidence, the immigration judge noted that Marini possessed a real fear of Coronel and Patino. He ruled, however, that Marini's dispute with these men did not result from a difference of political opinion. Rather, he concluded, it was a personal dispute. The Board agreed. Furthermore, both the immigration judge and the Board noted that Marini did not prove, in light of his close relationship with Colonel Myers and General Rodriguez, that Coronel or Patino possessed sufficient power to kill Marini.

## II. *Petitioner's Contentions*

Marini contends that (1) his "hearing on claims of political asylum and withholding of deportation was fundamentally unfair and violated his right to due process when he was denied an interpreter", and (2) the Board was arbitrary and capricious in dismissing his appeal of the immigration judge's order denying political asylum and withholding of deportation.

## III. *Lack of Interpreter*

Marini's present counsel argues that much of Marini's testimony was unresponsive and often incomprehensible, and that an interpreter was required.[10] It is conceded that this issue was not raised before the Board.[11]

8. Marini has acquired a criminal record for soliciting a prostitute, petty theft, drunk driving, and assault (the result of his tussle with Patino). It is unclear whether Marini was convicted on all of these charges. He also made a bomb threat, which proved to be a hoax, while flying Piedmont Airlines.

9. Acting from fear, Marini has not returned to Paraguay since 1980. He remained in the United States even when his mother recently became terminally ill and died.

10. At the initial hearing on February 21, 1984, when Marini was represented by his former counsel, the immigration judge said to counsel: "I take it the language will be Spanish." Counsel replied, "No, your honor, it's English." At the hearing on December 26, 1984, the judge inquired whether Marini read English. Marini responded that he did. In his Request for Asylum, Marini noted that he spoke five languages —Spanish, English, German, Italian and Portugese.

11. Marini's former counsel failed to file a brief after two requests for additional time had been granted. He did, however, set forth the issues in his notice of appeal to the Board. Marini's present counsel entered the case two days before Marini's brief was due, but did not file a brief or request a further extension of time. The claim that an interpreter was required was first raised in the petition for review in this court.

Subsequent to filing the petition for review in this court, Marini made a motion to reopen proceedings before the Board. The Board recently denied Marini's motion. During oral argument Marini's counsel moved to stay this appeal pending an appeal from the Board's recent decision to deny Marini's motion to reopen proceedings. We denied Marini's motion to stay this appeal, but permitted him to lodge with the clerk the documents in support of his motion to reopen. This opinion does not refer to nor does it rely on any facts presented in the documents lodged in support of the motion to reopen, as those documents were not a part of the proceeding of which Marini seeks review.

■ The INS regulations specifically require an alien to first present his motion to reopen deportation proceedings before the Board of Immigration Appeals. *See* 8 C.F.R. § 3.2 (1985) ("Reopening ... of any case ... shall be only upon written motion to the Board"). Because Marini failed to present his motion to reopen to the Board prior to this appeal, this court will not now consider Marini's claim that he was improperly denied an interpreter. *Roque-Carranza v. INS*, 778 F.2d 1373, 1373–74 (9th Cir.1985). *See also Bagues-Valles v. INS*, 779 F.2d 483, 484 (9th Cir.1985); *Tejeda-Mata v. INS*, 626 F.2d 721, 726 (9th Cir. 1980), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982). This court may only review Marini's motion to reopen upon a proper petition for review of the decision of the Board.

IV. *Denial of Request for Asylum*

■ The Request for Asylum, filed subsequent to the initiation of deportation proceedings, triggered two separate provisions of the Act—section 208(a), 8 U.S.C. § 1158(a), which grants political refugees asylum, and section 243(h), 8 U.S.C. § 1253(h), which prohibits deportation of an alien subject to political persecution in his own country. *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1281 (9th Cir.1985). Because Marini admitted deportability, he carries the burden of proof that he is eligible for asylum or withholding of deportation. *See Chatila v. INS*, 770 F.2d 786, 789 (9th Cir.1985) (alien must establish clear probability of persecution or well-founded fear of persecution). This court reviews the Board's initial findings under the substantial evidence standard. *Bolanos-Hernandez*, 767 F.2d at 1282 n. 8 and n. 9.[12]

An alien shall not be deported "to a country if [it is determined] that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h). Likewise, an alien can apply for asylum if he is a refugee who is "persecut[ed] or [has] a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). *See also* 8 U.S.C. § 1158. Thus, to obtain relief an alien must demonstrate potential threats or persecution on account of one of the enumerated reasons.

The Board reasoned:

Although [Marini] claims to be a member of a dissident faction of the ruling party since he was in high school, his disputes with these 2 men in the government appear to be entirely personal. One of these men allegedly took away part of his father's business, which is one reason he returned to Paraguay in 1979. Also, this same man allegedly threatened him in 1980, because he refused to become involved in a smuggling scheme. [Marini] has accused the other man publicly of corruption. Insofar as these men may wish [Marini] harm, we conclude they do so as the result of personal disputes,

---

**12.** This court reviews the Board's finding with regard to clear probability of persecution under section 243(h) for substantial evidence on the record as a whole. It also reviews the Board's finding with regard to a well-founded fear of persecution under section 208(a) for substantial evidence. It then applies an abuse of discretion standard to the Attorney General's ultimate decision to grant or deny asylum under section 208(a). *Bolanos-Hernandez,* 767 F.2d at 1282 n. 8 and n. 9.

which will not qualify him for asylum based on political activities or any other listed reason.

Marini contends that the Board erred in holding that his dispute with Coronel or Patino did not amount to a dispute based on political opinion.

■ "A clear probability that an alien's life or freedom is threatened, without any indication of the basis for the threat, is generally insufficient to constitute 'persecution'...." *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir.1985). To determine whether threats constitute political persecution, this court analyzes the basis of the threat, including the motivation of both the persecutor and the alien. "[W]e. may look to [their] political views and actions ..., and we may examine the relationship between the two [persons]." [13] *Id.* Several factors negate the probability that Coronel and Patino's death threats stem from a difference of political philosophies. The factors include Marini's close association with ruling members of the Paraguayan government, the lack of prior threats from Coronel and Patino, and the absence of a link between prior detentions and Coronel and Patino's ability to carry out their death threats.

■ After leaving Paraguay in 1980, Marini remained on good terms with the Paraguayan government, even though he disagreed with the government's political philosophies. Marini assisted the Paraguayan government in obtaining foreign credit and represented Paraguay in the Panama Canal ceremonies. He was offered the New York consulate's position. At present Marini maintains close associations with ruling members of the Colorado party. He speaks frequently with both General Rodriguez and Colonel Myers. Both men retain considerable power.

While maintaining satisfactory relations with other government officials, Marini opposed the corrupt practices of Coronel and Patino. Coronel did not threaten Marini until after Marini refused to participate in the proposed smuggling scheme. Patino, likewise, did not threaten Marini until after Marini accused him of embezzlement and engaged him in a fist fight. The death threats stem from personal hostility between Marini and Coronel and Patino.

Even though both men, as well as other government officials, were aware of Marini's different political opinions, neither man threatened Marini until a personal dispute arose. Coronel's police force did not previously detain Marini for anything more than curfew violations or illegal assembly. Marini did not indicate that the arrests resulted from his participation in the Guion Rojo. Marini distinguished the arrests made by the military from the arrests by the police. While the military detained him for several days, each time questioning him about his political opinions, he was released with no evidence of physical harm.

Marini, thus, fails to establish the necessary link between the death threats and his association with the Guion Rojo. *See Espinoza-Martinez v. INS*, 754 F.2d 1536, 1540 (9th Cir.1985); *Maroufi v. INS*, 772 F.2d 597, 599 (9th Cir.1985). The government never persecuted Marini, even in light of his political affiliation; rather it enlisted Marini's assistance. There is substantial evidence to support the findings of the Board that Coronel and Patino's death threats are grounded only in personal animosity, and that Marini did not accordingly qualify for asylum or withholding of deportation.

---

**13.** We have recognized that a conscious decision to remain neutral may amount to a political opinion because the decision not to join a political group may initiate the threat of violence. *See Diaz-Escobar v. INS*, 782 F.2d 1488, 1493 (9th Cir.1986); *Del Valle v. INS*, 776 F.2d 1407, 1413–14 (9th Cir.1985); *Bolanos-Hernandez*, 767 F.2d at 1286–87; *Argueta v. INS*, 759 F.2d 1395, 1397 (9th Cir.1985). Furthermore, we recognize that

[w]hen a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for governmental action, the most reasonable presumption is that the government's actions are politically motivated.

*Hernandez-Ortiz,* 777 F.2d at 516.

### V. *Conclusion*

We conclude that (1) the issue of whether an interpreter should have been provided is not properly before the court on this petition for review because it was not raised before the Board of Immigration Appeals; and (2) there was substantial evidence to support the finding of the Board that petitioner does not qualify for asylum or withholding of deportation because the alleged probability and fear of persecution did not result from a difference in political opinion. We affirm the Board's dismissal of the appeal and deny the petition for review.