91 F.3d 151
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Rafaela Concepcion ESPINOSA, aka Rafaela Concepcion
Espinosa-Rivera; Christian Emmanuel
Calderon-Espinosa, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE Respondent.
 No. 95-70033.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 10, 1996.*
Decided July 17, 1996.
 
 Before: GOODWIN, PREGERSON, and KOZINSKI, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Rafaela Espinoza-Rivera and Christian Calderon-Rivera, citizens of Nicaragua, appeal the decision of the Board of Immigration Appeals (the "BIA") affirming the denial of their application for asylum and withholding of deportation and their motion to reopen to apply for suspension of deportation.
 
 FACTS
 
 3
 The petitioners are a 30 year old female ("Petitioner") and her 12 year old minor son.
 
 
 4
 In 1979, during the time of the Sandinista revolution, Petitioner was living with her parents in Managua. Prior to the revolution, Petitioner's father had been a bodyguard for a cousin of Anastasio Somoza, the former president of Nicaragua. Petitioner's entire family were strong supporters of the Somoza regime, and her father was a member of Somoza's political party, the Liberal Independent Party. After the revolution, Petitioner's father was imprisoned for one year because of his close involvement with the Somoza regime. Petitioner's father was again imprisoned on several occasions in 1983. Petitioner's father died of a stroke in 1985. Petitioner's uncle was a member of the Contras, the U.S. backed opposition group.
 
 
 5
 Petitioner's family home was stoned by "Turbas", groups organized by the Sandinista sponsored CDS (Committee for the Defense of the Sandinistas), for the family's political activities.
 
 
 6
 In 1982 Petitioner moved in with Alvaro Calderon, a lieutenant in the Sandinista military. Shortly thereafter they had a son together. This relationship developed in spite of the fact that the two were on opposite political sides. Eventually, however, these differences surfaced in the context of how they were going to raise their son. Petitioner wanted the boy to be raised in the Catholic Church while Calderon, a strict Marxist, did not want his son to be involved with religion. Petitioner tried to resolve these difference with the help of the local CDS but it sided with the child's father. (They were never officially married, but apparently had a common-law marriage.)
 
 
 7
 After unsuccessfully trying to resolve her problems, Petitioner moved back to her parents' home with her son. (They lived only two blocks away.) Calderon tracked Petitioner down and, with the help of several soldiers, forced her to return home with him. Calderon told Petitioner that if she ever took his son away from him he would accuse her of being a Contra and make sure that she would "never see the light of day again."
 
 
 8
 Finally, in 1985, fearing for her own safety and the safety of her child, Petitioner fled Nicaragua, under the pretense of going to Mexico for vacation, and came to the U.S.
 
 
 9
 Petitioner presently has 4 sisters and 1 brother who are legal permanent residents and another brother who has filed an I-589 request for asylum. Since coming to the U.S., petitioner has given birth to another son who is a U.S. citizen. Petitioner's mother, whose immigration status is not in the record, resides with Petitioner and Petitioner's two sons.
 
 DISCUSSION
 I. ELIGIBILITY FOR ASYLUM
 
 10
 An alien is eligible for asylum if she establishes that she has suffered past persecution or has a "well-founded fear of persecution" on account of her race, religion, nationality, membership in a particular social group, or political opinion. I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 448-49 (1987). We review the BIA's denial of asylum to determine whether substantial evidence supports the finding that the petitioner failed to demonstrate either past persecution or a well-founded fear of persecution. Acewicz v. U.S.I.N.S., 984 F.2d 1056, 1061 (9th Cir.1993). If substantial evidence establishes that the petitioner is statutorily eligible for asylum, this Court then reviews the decision of the BIA for abuse of discretion. Id.
 
 A. Past Persecution
 
 11
 An alien seeking asylum based on past persecution must show that he was harmed on account of his race, religion, nationality, membership in a particular social group, or political opinion. See, e.g., Desir v. Ilchert, 840 F.2d 723, 727 (9th Cir.1988); U.S.C. § 1101(a)(42)(A).
 
 
 12
 Petitioner never really argues that she suffered past persecution. Nor could she. Calderon's behavior was based on personal differences over child rearing, not "on account of" Petitioner's political opinion.
 
 B. Well-founded Fear of Persecution
 
 13
 In order to prove a well-founded fear of persecution, the applicant must show that a reasonable person in the same circumstances would fear persecution. Elnager v. U.S.I.N.S., 930 F.2d 784, 786 (9th Cir.1991). A "well-founded fear" is both subjective and objective in that an alien must have a genuine fear of persecution and provide evidence that would support a reasonable fear of persecution. Estrada-Posadas v. U.S.I.N.S., 924 F.2d 916, 918 (9th Cir.1991). The Supreme Court has previously indicated that a 10% possibility of persecution is enough to establish a well-founded fear. Cardoza-Fonseca, 480 U.S. at 431.
 
 
 14
 Petitioner is afraid that if she were to return to Nicaragua Calderon or the Sandinistas would harm her. Petitioner's own anti-Sandinista views, coupled with those of her family that could be imputed to her, make her a target for persecution by the Sandinista groups that are still active in Nicaragua. Furthermore, Calderon promised to denounce her as a Contra, thereby imputing a political opinion to her. See Singh v. Ilchert, 69 F.3d 375, 379 (9th Cir.1995) (recognizing theory of imputed political opinion).
 
 
 15
 Petitioner's personal dispute with Calderon cannot provide the basis for a well-founded fear of persecution. See Zayas-Marini v. I.N.S., 785 F.2d 801, 806 (9th Cir.1986) (although petitioner held a political opinion contrary to that of the two government officials who threatened him, he feared harm on account of a personal dispute not on account of political opinion). Therefore, the only scenario under which Petitioner faces persecution is one under which Sandinistas, besides Calderon, attack Petitioner on account of her actual or imputed political opinion.
 
 
 16
 There is sufficient evidence in the record from which we can conclude that there are Sandinistas who, independently of Calderon, still remember Petitioner and her family for their anti-Sandinista views. The record further establishes that there are still groups of Sandinistas actively involved in the persecution of ex-Contras. Couple these facts with Calderon's promise to denounce Petitioner as a Contra, and it becomes obvious that there is at least a 10% chance that Petitioner could be persecuted on account of political opinion if she were to return to Nicaragua.
 
 
 17
 Petitioner has established a well-founded fear of persecution. Therefore, we reverse the decision of the BIA which denied Petitioner political asylum.
 
 II. WITHHOLDING OF DEPORTATION
 
 18
 In order to qualify for the mandatory grant of withholding of deportation, an alien must establish that there is a clear probability of persecution on account of one of the enumerated grounds if he or she were to be returned to the country in question. I.N.S. v. Stevic, 467 U.S. 407, 424 (1984).
 
 
 19
 Petitioner is unable to satisfy the higher burden of proof for withholding of deportation. The record does not show that it is more likely than not that Petitioner would be persecuted if she were to return to Nicaragua. Therefore, we affirm the denial of withholding of deportation.
 
 III. SUSPENSION OF DEPORTATION
 
 20
 The BIA denied Petitioner's (and her alien son's) motion to reopen to apply for suspension of deportation because it believed that Petitioner had not established a prima facie case for suspension. We review the BIA's decision for abuse of discretion. I.N.S. v. Rios-Pineda, 471 U.S. 444, 451 (1985). The denial of a motion to reopen will be upheld unless it is "arbitrary, irrational, or contrary to law." Ahwazi v. I.N.S., 751 F.2d 1120, 1122 (9th Cir.1985).
 
 
 21
 An applicant for suspension of deportation is required to prove that she has been physically present in the United States for a continuous period not less than seven years immediately preceding the date of such application and that during that period was and is a person of good moral character. Finally, the applicant must prove that she is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his or her spouse, parent, or child who is a citizen of the United States or an alien lawfully admitted for permanent residence. See 8 U.S.C. 1254(a)(1).
 
 
 22
 Petitioner satisfied the first two prongs of the test, but the BIA did not believe that Petitioner or her son would suffer "extreme hardship" if they were deported to Nicaragua. In evaluating a claim of extreme hardship, the BIA must consider: the age and health of the alien; family ties in the U.S. and abroad, length of residence in the United States; the economic and political conditions in the country to which the alien is returnable; financial status of the alien; the possibility of other means of adjustment of status; immigration history; the alien's position in the community; and any special assistance he or she may have provided to the U.S. or the community in which he or she has lived. Matter of Anderson, 16 I & N Dec. 596, 597 (BIA 1978). These factors must be viewed in the aggregate. Villena v. I.N.S., 622 F.2d 1352, 1358 (9th Cir.1980). In this case, we examine how these factors relate both to Petitioner and her alien son.
 
 
 23
 Except for extremely rare cases, economic detriment alone is not enough to establish an "extreme hardship." See Santana-Figueroa v. I.N.S., 644 F.2d 1354, 1356-58 (9th Cir.1981) ("When an alien would be deprived of the means to survive, or condemned to exist in life threatening squalor, the 'economic' character of the hardship makes it no less severe"). Although Petitioner would face serious economic difficulties, they are not so severe as to condemn Petitioner to "life threatening squalor."
 
 
 24
 Nevertheless, the aggregate effect of the economic hardship and other non-economic factors constitute an extreme hardship on Petitioner and her alien son if they are deported to Nicaragua. For example, all of their close relatives live in the U.S., Petitioner's U.S. citizen son has always lived in the U.S., and Petitioner's alien son has lived here all but two years of his life and would find it very difficult to adjust to life in Nicaragua. At a minimum, Petitioner should have been granted a hearing to more closely examine both the effect of separating Petitioner and her two sons from all of their close relatives and the effect of moving the citizen child to Nicaragua. See Villena, 622 F.2d at 1359 ("Because the nature and extent of hardship to a citizen child is difficult to discern without a hearing, circumstances that suggest that the alien's deportation would cause extreme hardship to [a] child warrant a hearing.") (footnote omitted).
 
 
 25
 The BIA abused its discretion in denying Petitioners' motion to reopen their application to apply for suspension of deportation.
 
 CONCLUSION
 
 26
 We REVERSE the decision of the BIA denying asylum and remand for further proceedings. The attorney general should determine in the exercise of her discretion whether to grant asylum to Petitioner. 8 U.S.C. § 1158(a). We affirm the denial of withholding of deportation. We REVERSE the decision of the BIA denying the motion to reopen to apply for suspension of deportation and REMAND for further proceedings consistent with this opinion.
 
 
 27
 AFFIRMED in part, REVERSED and REMANDED.
 
 
 28
 Petitioners are entitled to their costs on appeal.
 
 
 29
 KOZINSKI, Circuit Judge, dissenting in part.
 
 
 30
 After painting a sympathetic portrait of petitioner's situation, it "becomes obvious" to my colleagues that "there is at least a 10% chance that [she] could be persecuted on account of political opinion were she to return to Nicaragua." Maj. op. at 5. The question, however, is not what conclusion we would reach after reviewing the record de novo, but whether the BIA was required to buy petitioner's story. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Of course, if we believe every word petitioner says, and draw every inference favorable to her, we can justify almost any outcome. Given, however, that petitioner failed to "offer any objective evidence that anyone in circumstances much like her own has been or will be singled out for persecution," the BIA was entitled to be skeptical. Gonzalez v. INS, 77 F.3d 1015, 1023 (7th Cir.1996).
 
 
 31
 The primary threat to petitioner's safety stems from a personal dispute with her ex-boyfriend, which we have held is not an adequate ground for asylum. Zayas-Marini v. INS, 785 F.2d 801, 806 (9th Cir.1986). Even assuming that this caused petitioner's ex-boyfriend to denounce her as a Contra (an assumption which is totally unsubstantiated by the record) it is highly unlikely that anyone would remember the denunciation more than ten years after the fact. Petitioner asserts that, even if her ex-boyfriend did not denounce her at the time of her departure, he may carry out this threat if she returns to Nicaragua. Administrative Record at 192-93. Again, however, the record is devoid of evidence that, after ten years, petitioner's ex-boyfriend still carries a grudge against her and remains in a position to make good on his threat.
 
 
 32
 The simple fact is that Nicaragua is not the same place as when petitioner departed ten years ago. There has been a meaningful change in government--the Sandinistas were ousted from power and Violeta Chamorro was elected president. It may be true that the Sandinistas maintain a degree of control, but whatever risk petitioner suffers from having opposed the Sandinista government is shared by the 59% of the electorate that voted against it six years ago. See Mark A. Uhlig, Turnover in Nicaragua, N.Y. Times, Feb 27, 1990, at A1 (reporting that, with 82% of the ballots counted, the Sandinistas received only 40.8% of the vote in 1990 presidential elections). I cannot join my colleagues in concluding that someone is entitled to asylum in the United States because she is known to have supported the current government in her native country. Far less can I say that the BIA could not rationally reach the opposite conclusion. I respectfully dissent.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Circuit Rule 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3