**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YAN XIA ZHU,

*Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney General,

*Respondent.*

No. 06-72967

Agency No.
A78-399-759

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 8, 2008—Pasadena, California

Filed July 31, 2008

Before: William A. Fletcher and Ronald M. Gould,
Circuit Judges, and Louis H. Pollak,* Senior District Judge.

Opinion by Judge Pollak;
Concurrence by Judge Gould

---

*The Honorable Louis H. Pollak, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

9681

## COUNSEL

David Z. Su, Monterey Park, California, for the petitioner.

Sada Manickam and Jacob A. Bashyrov, U.S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

POLLAK, District Judge:

Petitioner Yan Xia Zhu seeks review of the Board of Immigration Appeals' ("BIA") order affirming the opinion of the

immigration judge ("IJ") denying petitioner's applications for relief from removal. The BIA adopted the IJ's opinion holding that petitioner's testimony was not credible, and that her testimony, even if believed, did not establish eligibility for asylum. For the reasons given below, we grant her petition for review and remand for further proceedings.

## I.

Petitioner is a 34-year-old native and citizen of China. On July 4, 2000, she attempted to enter the United States with a false passport. She was served with a notice to appear, admitted its allegations, and conceded removability. She applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

During the hearing on her applications for relief, on October 25, 2004, petitioner testified — through a translator — that, prior to leaving China in 2000 at the age of 26, she had worked in a state-owned clothing factory for five or six years. The manager of her factory, Fu Jie Zhang, was a married man over the age of 40 who was "always talking some nasty words in front of the female employees."

Petitioner testified that, in February 2000, petitioner along with other female employees reported the manager's inappropriate comments to the head of the factory, who responded that they should keep quiet because the manager "has very big friendship net with the upper level authorities."

Petitioner testified that on March 28, 2000, the manager hit her, causing her to lose consciousness, and then raped her. The incident began when petitioner was called to the manager's office after work had ended:

> He said I will promote you to be a group leader. I say okay. And, he — then he said you look beautiful today. Then after that, he continued to say some

nasty words to me. . . . And then, he asked me to sit down and asked me, said you can be my wife. And then, I say no. And then he used his hand, and I was scared. And, I want to run away. And then he grabbed my clothes and give me a beat. . . . Then, he made a hit and then I faint. I lose my consciousness. . . . I fell. He hit me on my head. And then, I was so scared. . . . When I woke up, I felt a headache, so I believe he used his hand to beat my head. . . . I felt I was on the sofa. . . . I was so scared, I was crying. And I put on my clothes. Then I returned home. . . . There, I was crying. My parents — my parents felt why I came back so late that night, and they saw my eyes were red. And then I was crying. And, I told my parents about that. And then my mother was crying too. And both my parents were so angry. . . . And later on, when they were calmed down, and they said since he has a big power, you know, and we just unlucky to have this kind of thing happen on us. . . . My mother told me, we just forget about this. He has a big power. He would say these kind of things to others. It's kind of shameful for us.

Petitioner testified that she knew she had been raped when she woke up because she felt "painful in [her] lower body" and "saw the red — some red in [her] pants."

Petitioner felt unable to eat or go to work and went to stay at her cousin's home in a village twenty minutes away by bicycle. Petitioner testified that she "dare[d] not to report [the rape] at the very beginning . . . . because first, this person has power. And second, this kind of thing is kind of shameful in [her] countryside area." However, her cousin tried to convince her to report the rape, and petitioner began to feel angry and that she "could not swallow this."

Petitioner testified that, at the end of April 2000, approximately one month after the rape, she wrote a letter to the town

government "request[ing] the town government to make an investigation" into her rape by the factory manager, who also held a political position. The letter — of which petitioner did not keep a copy — also complained that "the government officers even let this kind of a person to be an officer"; that the factory manager only got his political position because a "town government officer . . . was his relative and helped him to get his position"; that other officials "protect this person" "because the government officer[ ] is his relative"; and that "[i]f we cannot get rid of this kind of people, our country will be corrupt."

Petitioner testified that, a week after she mailed the letter, on the second or third day of May, her mother called her at her cousin's house to tell her that policemen had come to their house to try to arrest petitioner. Petitioner's mother reported that the police had told her that her "daughter wrote a letter and tried to sue the government" and that petitioner had thus done "something against the government." Petitioner's mother, whom petitioner had not told about sending the letter, scolded her for writing it.

The police went to petitioner's family's home a second time, a few days later, on May 6 or May 7, 2000. Petitioner testified that the police continued to visit her family's home looking for her after she left China, with the last such visit being Chinese New Year in 2002. (Petitioner speculated that they came on that day "because that's a family gathering day for Chinese people.")

Petitioner testified that she left China on June 1, 2000. A smuggler brought her and ten others to the United States via Hong Kong and Chile. She arrived in the United States on July 4, 2000 and was apprehended at the Miami airport carrying a false Malaysian passport.

Petitioner testified that she finds it difficult to maintain normal sexual relationships with men because of her rape by the

factory manager; she has been married and divorced since coming to the United States. She submitted a psychiatrist's evaluation describing her "problems of re-experiencing the trauma of being raped by a man in China four years ago, especially during sexual intercourse, and her inability to maintain a relationship."

The IJ entered an adverse credibility finding against petitioner and found, as a result, that petitioner had not presented credible evidence in support of her applications for asylum, withholding of removal, and CAT relief. With respect to petitioner's asylum application, the IJ also found, in the alternative, that petitioner was not eligible for asylum because her testimony, even if credited, did not establish mistreatment on a protected ground. The BIA affirmed, adopting the opinion of the IJ.

## II.

We review for substantial evidence the BIA's decision that an alien has not established eligibility for asylum. *Gu v. Gonzales*, 454 F.3d 1014, 1018 (9th Cir. 2006). We must uphold the BIA's determination if it is "supported by reasonable, substantial, and probative evidence in the record." *Lopez v. Ashcroft*, 366 F.3d 799, 802 (9th Cir. 2004) (internal citation and quotation marks omitted). Under the Immigration and Nationality Act, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We review questions of law *de novo*. *Chuyon Yon Hong v. Mukasey*, 518 F.3d 1030, 1034 (9th Cir. 2008).

In denying petitioner's appeal, the BIA issued an order citing *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994), rather than an opinion. "The BIA thereby signaled 'that it had conducted an independent review of the record and had exercised its own discretion in determining that its conclusions were the same as those articulated by the IJ.' " *Sembiring v.*

*Gonzales*, 499 F.3d 981, 985 (9th Cir. 2007) (quoting *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc)).

### III.

Petitioner bears the burden of establishing her eligibility for asylum and withholding of removal. *Chebchoub v. INS*, 257 F.3d 1038, 1042 (9th Cir. 2001). Petitioner "must demonstrate that [she] has suffered past persecution or has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* (citing 8 U.S.C. § 1101(a)(42)(A)). " 'Because asylum cases are inherently difficult to prove, an applicant may establish his case though his own testimony alone.' " *Id.* (quoting *Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997)). However, "if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal to his asylum application." *Sidhu v. INS*, 220 F.3d 1085, 1090 (9th Cir. 2000) (citing 8 C.F.R. § 208.13).

### A.   Adverse Credibility Finding

Petitioner contends that the IJ's adverse credibility finding is not supported by substantial evidence.

**[1]** "To support an adverse credibility determination, the BIA must have a 'legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief.' " *Wang v. Ashcroft*, 341 F.3d 1015, 1022 (9th Cir. 2003) (quoting *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir. 1996)). " 'Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence.' " *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1071 (9th Cir. 2000)).

"It is well settled in our circuit that minor inconsistencies that do not go to the heart of an applicant's claim for asylum cannot support an adverse credibility determination." *Kaur v. Gonzales*, 418 F.3d 1061, 1064 (9th Cir. 2005). "The concern underlying . . . our decisions in this arena has been to avoid premising an adverse credibility finding on an applicant's failure to remember non-material, trivial details that were only incidentally related to her claim of persecution." *Id.* "This concern is heightened where the alien receives the assistance of a translator to aid in the preparation of her asylum application." *Id.* at 1064-65.[1]

"[T]he IJ 'must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum.' " *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007) (quoting *Ordonez v. INS*, 345 F.3d 777, 786 (9th Cir. 2003)). "An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency." *Kaur*, 379 F.3d at 887.

In determining whether substantial evidence supports an adverse credibility finding, the court evaluates each of the grounds cited by the IJ for its finding. *Wang*, 341 F.3d at 1021.

The first and principal basis for the IJ's adverse credibility finding was the inherent implausibility of petitioner's testimony regarding the rape itself:

---

[1]Because petitioner filed her asylum application before May 5, 2005, the provision of the REAL ID Act providing that an adverse credibility finding may be supported by minor inconsistencies does not apply. *See Don*, 476 F.3d at 741 n.4 (citing *Kaur*, 418 F.3d at 1064 n.1); 8 U.S.C. § 1158(b)(1)(B)(iii) (2008) (providing that even inconsistencies not going to the heart of an asylum claim are a proper basis for an adverse credibility finding).

> Although [petitioner] claimed to have been knocked out for approximately one hour, during which time she was disrobed and raped, she testified that she was not injured and upon returning home, she did not see a doctor for either her rape or any possible injury to her head or brain. This is inherently improbable testimony and obviously the testimony of someone who has never been knocked unconscious, nor raped.

The IJ repeated later in his opinion: "Further, the court finds that if [petitioner] had been raped, she would have seen a doctor." The IJ also found it "preposterous to believe that [petitioner] could have been knocked unconscious for one hour from being slapped on the head," and that if she had hit her head on a table while falling, as petitioner speculated she might have done,[2] "it would be reasonable to expect more serious injuries than what [she] reported, particularly for her to be unconscious for one hour."

The government's brief does not defend this ground for the IJ's adverse credibility finding, or even acknowledge it in the brief's argument section. (It is mentioned in the fact section.)

[2] The court agrees with petitioner that the IJ's assessment of petitioner's account as "inherently improbable" is not supported by substantial evidence. First, the IJ's finding that petitioner's story was not plausible because, after being knocked unconscious and raped, a person would necessarily have gone to a doctor, is mere speculation and conjecture — not a proper basis for an adverse credibility finding.[3] *Cf. Kaur*, 379 F.3d at

---

[2]Petitioner had told a psychologist that she hit her head on a table while falling from the manager's blow. When confronted with this portion of the report, petitioner responded, "Because when I woke up, I felt headache, so that's why I told my doctor this. And maybe when I fell — after I was beat, maybe when I fell to the ground, while I was falling to the ground, my head hit somewhere."

[3]As Judge Gould eloquently suggests in his concurring opinion, such reasoning is not only unfounded in record evidence, but is also almost certainly simply wrong.

887 (rejecting adverse credibility finding "based on [the IJ's] personal conjecture about the manner in which Indian passport officials carry out their duties"); *Singh v. INS*, 292 F.3d 1017, 1024 (9th Cir. 2002) (rejecting as basis for adverse credibility finding the IJ's speculation about the police's intentions in arresting petitioner); *Gui v. INS*, 280 F.3d 1217, 1226 (9th Cir. 2002) (rejecting as basis for adverse credibility finding "the IJ's own opinions as to how best to silence a dissident"). Second, petitioner offered an explanation for her failure to go to the doctor — that she "dare[d] not" go — which the IJ did not address. "An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency." *Kaur*, 379 F.3d at 887. Third, the IJ's conclusion that it was "preposterous to believe" that petitioner would be knocked out by a "slap" that caused no injury, misstates the record. The translator's choice of words, although neither idiomatic nor precise, indicates more force than a slap: "And then he grabbed my clothes and give me a beat . . . . Then, he made a hit and then I faint." And, contrary to the IJ's characterization of petitioner's testimony as being that she "was not injured," petitioner testified that she "felt a headache" when she woke up, and that she knew she had been raped because she felt "painful in [her] lower body" and saw blood in her underwear. In sum, the principal basis for the IJ's adverse credibility finding — that petitioner's story was inherently implausible —is founded in speculation and is not supported by substantial evidence.

The second ground for the IJ's adverse credibility finding was based on petitioner's airport interview. At the airport interview, petitioner was asked why she came to the United States:

> Q:  What was your purpose in attempting to enter the United States today?
>
> A:  I was persecuted by my boss, I work in a factory. He wants me to marry him and he is

already married. That is why I ran away from
him.

Q:   How much money do you have with you?

At her hearing, the IJ asked petitioner whether she remem-
bered making this statement, and she responded that she did
not. She then testified, upon further questioning by the IJ, that
"the smuggler told us that we need to say it this way." The IJ
found that "[i]t is not reasonable to believe that the smuggler
would have told her to simply say that she ran away because
her manager wanted to marry her; it is more reasonable to
believe that [the] smuggler would tell her to say that she was
persecuted." The IJ also noted that, "[s]ignificantly, at no time
[during the airport interview] did she mention her attempted
arrest by the police or being accused of being anti-
government."

**[3]** This court has repeatedly "hesitate[d] to view state-
ments given during airport interviews as valuable impeach-
ment sources because of the conditions under which they are
taken and because a newly-arriving alien cannot be expected
to divulge every detail of the persecution he or she sustained."
*Li v. Ashcroft*, 378 F.3d 959, 962-63 (9th Cir. 2004) (citing
cases). Such interviews are "perfunctory examination[s]" that
"hardly provide[ ] an opportunity to explain [one's] circum-
stances." *Singh*, 292 F.3d at 1023. Where an IJ "plac[es] too
much reliance on an airport interview . . . and ignor[es] more
detailed accounts," the IJ "seriously undermine[s] the reliabil-
ity of the administrative process." *Id*. (internal quotation omit-
ted).

Citing *Singh v. Ashcroft*, 362 F.3d 1164 (9th Cir. 2004) (as
amended), petitioner contends that her airport interview did
not provide her with a meaningful opportunity to give a
detailed account of what happened to her in China, because
when petitioner stated that she was persecuted by her boss,
who wanted to marry her, the interviewing officer immedi-

ately moved on to a new topic. *Cf. id.* at 1170-71 (rejecting omission of facts in initial testimony as basis for adverse credibility finding where subsequent, more detailed testimony was not apparently inconsistent with the initial testimony, and where the BIA did not explain why the two were inconsistent).

**[4]** The court agrees with petitioner that her failure to mention her rape and attempted arrests at her airport interview is not a proper basis for an adverse credibility finding under the circumstances. Unlike in *Li*, where the petitioner affirmatively gave an entirely different explanation for his arrival in the United States in his airport interview, *see* 378 F.3d at 963, here, petitioner's statements that she left China because her boss wanted to make her his wife and was threatening her family are not inconsistent with her subsequent testimony; rather, they constitute a vague outline of her more detailed testimony at the hearing. (She testified at her hearing that, when she went to her boss's office on March 28, 2000, at first "he just want to try to say some sweet words. He want me to be his second wife.") Petitioner was asked no follow-up questions in response to her answers at the airport, and under *Li* and *Singh* such factual omissions are not a proper basis for an adverse credibility finding. Furthermore, the IJ's view as to what a smuggler would or would not have told petitioner to say in her airport interview is not substantial evidence supporting a finding that petitioner's subsequent, detailed testimony regarding her rape was not credible, and petitioner's recital of what the smuggler advised her to say does not go to the heart of her claim.[4]

---

[4]With respect to this basis for the adverse credibility finding, the government asserts without elaboration or citation to the record that "the inconsistencies between Zhu's oral testimony and her asylum interview were fatal to her credibility and go to the heart of her asylum claim" because "Zhu gave inconsistent testimony about whether she was persecuted by her boss or whether her smuggler instructed her to provide this explanation." The government misstates the inconsistency identified by

A third basis for the adverse credibility finding, briefly touched on by the IJ (and defended in a single sentence in the government's brief, without citation to the record), was that the IJ found it "difficult to understand how the report of [petitioner's] psychologist can state that [petitioner] is suffering today from the memory of her rape, while [petitioner] claims that she does not remember her rape because she was unconscious." This finding appears to reflect only the IJ's own speculation about whether a person could be traumatized by waking up unclothed, bleeding, and with a headache after having apparently been knocked out and raped. The psychologist's report is consistent with petitioner's testimony that she fell unconscious before the rape, and it describes petitioner's emotional problems in detail. The court finds that this basis for the adverse credibility finding is not supported by substantial evidence.

A fourth basis for the IJ's adverse credibility finding — not mentioned in the government's brief — was that, whereas petitioner stated in her asylum application that the factory manager's relative was the town governor, at the hearing petitioner "stated that she did not know who the relative was, but had just heard from other employees that it was someone in the government." The apparent source of the IJ's finding is an exchange in which, following a series of questions regarding the name of the factory manager, petitioner was asked by the IJ, "Who was the relative that he had in the government?" Petitioner responded that she did not know.

the IJ. Petitioner's testimony and her airport interview are consistent in stating that she was persecuted by her boss. Rather, the inconsistency identified by the IJ was that in her airport interview, petitioner omitted the details of the rape and beating by her boss, details which she first mentioned in a second interview sixteen days later, on July 20, 2004. The IJ did not believe petitioner's explanation for this omission, which was that her statement at the airport was what the smuggler told petitioner to say; the IJ found it incredible that petitioner would be instructed to say something so mild as that her boss wanted to marry her.

Petitioner contends that there is no inconsistency between her asylum application and her testimony in this respect, because petitioner's testimony that the factory manager "has power" because "[h]is relative is an officer in government" was consistent with her asylum application.

The IJ never directly asked petitioner for the precise position in government held by the factory manager's relative. Because the IJ's question — "Who was the relative that he had in the government?" — immediately followed questions concerning the name of the factory manager, the IJ's imprecise question could have been interpreted as "what is the name of the relative" — the answer to which was not in petitioner's asylum application. Because petitioner was never directly asked for the position held by the relative, and never confronted with the purported inconsistency with her asylum application, her answer to the IJ's ambiguous question is not a proper ground for discrediting her testimony. *See Don*, 476 F.3d at 741 ("[T]he IJ 'must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that form the basis of a denial of asylum.' " (quoting *Ordonez*, 345 F.3d at 786)).

The IJ noted two final inconsistencies in petitioner's testimony, prefaced by the qualification that the inconsistencies would "probably not be considered as going to the heart of her asylum claim." The court agrees with the IJ that these purported inconsistencies are insufficient to support an adverse credibility finding. The first, not mentioned or defended by the government in its brief, was that, while petitioner initially testified that both of her children were living with her at home in the United States, when confronted with the portion of the psychologist's report stating that one of her children was living in China, "she recanted her testimony and admitted that one child was living with a cousin in China." Petitioner's testimony hardly qualifies as recanting:

    Q:   . . . Where are those children today?

A:  At home.

Q:  . . . . Is that true [that one child is in China, as
    reported by the psychologist]?

A:  One is here; one in China.

Q:  Except, you just told me that both children were
    here in the United States. So, why did you tell
    me that, ma'am?

A:  I thought you referring [sic] to the one child.

In addition to the fact that, as the IJ himself noted, this incon-
sistency does not go to the heart of the asylum claim, petition-
er's brief offers the additional explanation that a translation
problem may have been the cause of petitioner's first answer.
Petitioner in her brief "respectfully requests the Court take
judicial notice that in Chinese language, there is no plural
form of the word 'child.' " *Cf. Kaur*, 418 F.3d at 1064-65
(noting that placing weight on inconsistencies not going to the
heart of an asylum claim is especially problematic where
there may be translation problems).

The second of these inconsistencies — cited by the govern-
ment as substantial evidence in support of the adverse credi-
bility finding — was that petitioner initially testified that she
obtained her false passport in Hong Kong, but subsequently
testified that she had obtained it in Chile. Petitioner testified
(and it is undisputed) that during her journey to the United
States, guided by a smuggler, she went first to Hong Kong,
and then to Chile. The inconsistency about whether she
acquired her passport in Hong Kong or in Chile not only fails
to go to the heart of her asylum claim, but is also easily
explained as the mere product of a lapse of memory or confu-
sion. Indeed, after the long series of questions with regard to
the passport's origin — culminating in the interpreter saying,
"Your Honor, may I verify, because I got confused too" —

petitioner attributed her mistake about the passport's origin to a lapse of memory. As the IJ suggested, this inconsistency is not substantial evidence in support of the IJ's adverse credibility finding.

[5] In sum, the principal ground for the IJ's adverse credibility finding, not defended by the government, was based on the IJ's view, unsupported by any evidence, that a rape victim in petitioner's position would have gone to a doctor. The remaining grounds cited by the IJ, only some of which are defended by the government, are also based on speculation, are contradicted by the record, or are minor inconsistencies that do not go to the heart of petitioner's claim. The court therefore holds that the adverse credibility finding was not supported by substantial evidence.

## B.   Protected Ground

The IJ's alternative ground for denying petitioner's asylum application was that, even if petitioner's testimony were credited, she failed to establish mistreatment on a protected ground.

[6] In order to prove mistreatment on account of political opinion, petitioner "must show (1) that [she] had either an affirmative or imputed political opinion, and (2) that [she was] targeted on account of that opinion." *Sagaydak v. Gonzales*, 405 F.3d 1035, 1042 (9th Cir. 2005) (emphasis and footnote omitted). "[A] victim who is targeted for exposing government corruption is persecuted 'on account of' political opinion" because "[r]etaliation for investigating or publicizing corruption by political figures is by its very nature a political act." *Id.* (citing *Reyes-Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999)). Accordingly, " 'retaliation for the act of publicizing corruption amounts to persecution on account of a political opinion' even when the petitioner 'did not espouse a political theory.' " *Id.* (quoting *Hasan v. Ashcroft*, 380 F.3d 1114, 1120 (9th Cir. 2004)).

"Purely personal retribution is, of course, not persecution on account of political opinion." *Grava v. INS*, 205 F.3d 1177, 1181 n.3 (9th Cir. 2000). However, where a persecutor has both personal and political motives for retaliating against a political opponent, the persecutor's mixed motives do "not render the opposition any less political, or the opponent any less deserving of asylum." *Id.* Accordingly, in *Fedunyak v. Gonzales*, 477 F.3d 1126 (9th Cir. 2007), we held that the petitioner's "whistle-blowing was political because — in criticizing the local regime's failure to stop the extortion scheme — his acts were 'directed toward a governing institution' and not 'only against individuals whose corruption was aberrational.' " *Id.* at 1129 (quoting *Grava*, 205 F.3d at 1181). The fact that "some of the persecution suffered by Fedunyak may have been motivated by the personal greed of local officials" did not defeat his claim, because his "testimony that he was harassed, threatened and assaulted for raising complaints about the extortion scheme adequately establishe[d] that the persecution was — at least in part — a response to his political opinion expressed through his whistle-blowing." *Id.* at 1130.

In the case at bar, the IJ found that petitioner's testimony, even if believed, did not relate to a protected ground:

> Accusing [petitioner] of being anti-government did not make her mistreatment based upon imputed political opinion. Rather, the accusation in itself is just another form of mistreatment. If what [petitioner] has said were true, the police knew that she had reported that her boss raped her, not that she had adopted any opposition political view or was associated with any political party. No testimony or evidence was presented that [petitioner] belonged to any political party or was believed to belong to any political party that opposed the Chinese government.

**[7]** This conclusion misstates the applicable law and is not supported by substantial evidence. Petitioner's letter to the

town government was more than a report of the rape: She condemned the appointment and protection — on the basis of family political connections — of people like the manager who raped her. "If we cannot get rid of this kind of people," she wrote, "our country will be corrupt." The letter prompted the police to come to her family's home a week later. The police did not tell petitioner's mother that they came to investigate the rape, or to arrest petitioner for reporting the rape. Rather, the police told her mother that they were coming to arrest petitioner because she "wrote a letter and tried to sue the government" and did "something against the government." The police persisted in repeated attempts to arrest petitioner for nineteen months thereafter. As in *Fedunyak*, petitioner's testimony establishes that the attempts to arrest her were "— at least in part — a response to [her] political opinion expressed through [her] whistle-blowing." 477 F.3d at 1130. This "[r]etaliation for investigating or publicizing corruption by political figures is by its very nature a political act" — regardless of whether petitioner was associated with a particular political party. *Sagaydak*, 405 F.3d at 1042.

[8] In support of the government's position that petitioner did not suffer mistreatment on a protected ground because she had a mere "personal dispute" with the factory manager, the government's brief cites a single case, *Zayas-Marini v. INS*, 785 F.2d 801 (9th Cir. 1986). In *Zayas-Marini*, we affirmed the BIA's holding that the petitioner's disputes with two men in Paraguay who had threatened his life were based solely on personal animosity and therefore were not grounds for asylum. The petitioner's dispute with the men arose, in part, out of the petitioner's public accusations of corruption against the two men, and in part out of a private business dispute. *See id.* at 805-06. Unlike in this case, however, the petitioner had a "close association with ruling members of the Paraguayan government": he "assisted the Paraguayan government in obtaining foreign credit," "represented Paraguay in the Panama Canal ceremonies," "was offered the New York consulate's position," and continued to "maintain[ ] close

associations with ruling members of the Colorado party," two of whom "retain[ed] considerable power." *Id*. at 806. We therefore found that substantial evidence supported the BIA's holding that petitioner's disputes with the two men were "grounded only in personal animosity," and that "[t]he government never persecuted [the petitioner], even in light of his political affiliation; rather it enlisted [his] assistance." *Id*. The case at bar is unlike *Zayas-Marini*, because in this case, the threat to petitioner in response to her complaint about corruption came from the government itself — in the form of the police — rather than directly from the factory manager, and there is no evidence that petitioner has allies in the local government to protect her from persecution. Although petitioner's dispute with the factory manager started out as a "personal dispute" when he raped her, her complaint to the town government about the manager's protection was interpreted as an act of political dissent, and the police repeatedly sought to arrest her in response to that act.

We note, further, that the United States Department of State's 2003 report on China's human rights practices, which was entered into the record before the IJ, confirms that the police "frequently" harassed, detained, and imprisoned citizens who protested against corruption. The report states that "[c]orruption at the local level was widespread" within Chinese law enforcement; that "[p]olice officers reportedly coerced victims, took individuals into custody without due cause, . . . and mentally and physically abused victims and perpetrators"; that public discussion of corruption was "tightly controlled" because newspapers were required to obtain government and Communist Party approval before reporting on corruption, and because journalists and editors who reported on "subjects that met with the Government's or local authorities' disapproval, including corruption" were harassed, detained, and imprisoned; and that ordinary persons who were "critical of official corruption or malfeasance . . . frequently were threatened, detained, or imprisoned."

**[9]** We hold that the IJ's finding that petitioner did not suffer mistreatment on a protected ground was not supported by substantial evidence. Petitioner's testimony adequately established that the police repeatedly sought to arrest her on the basis of a political opinion imputed to her as the result of her whistle-blowing. Petitioner thus has satisfied the requirement for asylum that she be mistreated "on account of" a protected ground — in this case, political opinion. *See* 8 U.S.C. § 1101(a)(42)(A).

IV.

Having held that the BIA's adverse credibility finding is not supported by substantial evidence, and that the police sought to arrest petitioner "on account of" a protected ground, we will grant the petition for review and remand to the BIA for a determination whether petitioner is eligible for relief.

We reject petitioner's contention that, if her testimony is believed, she has established eligibility for asylum, withholding of removal, and CAT relief, and that, therefore, no remand is necessary in this case. Under *INS v. Ventura*, 537 U.S. 12 (2002) (per curiam), when the BIA has not considered an issue, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 16 (internal citation and quotation marks omitted) (holding that remand was warranted following the court of appeals' reversal of the BIA's holding that petitioner's persecution was not "on account of" political opinion). The BIA has not yet considered whether petitioner has fulfilled her burden of proving a well-founded fear of persecution; the BIA adopted the opinion of the IJ, who expressly declined to decide whether petitioner had suffered past persecution or had a well-founded fear of future persecution in China. *See Lin v. Gonzales*, 472 F.3d 1131, 1135-36 (9th Cir. 2007) (holding that petitioner satisfied the "on account of political opinion" component for eligibility and remanding for the BIA to deter-

mine whether petitioner had suffered past persecution or had well-founded fear of future persecution).

The cases cited by petitioner — where we have found petitioners eligible for asylum — fall into the exceptional category of cases related to forced abortions and sterilizations. Congress has provided that victims of forced abortions and sterilizations are automatically eligible for asylum. *See* 8 U.S.C. § 1101(a)(42)(B). We have held that this automatic eligibility creates a "rare circumstance" justifying a departure from the *Ventura* remand rule. *Zheng v. Ashcroft*, 397 F.3d 1139, 1148 (9th Cir. 2005). Following reversal of an adverse credibility finding in such cases, a remand for "a determination of asylum eligibility is not necessary [because] the petitioner is 'automatically eligible for asylum' if his testimony is believed." *Id.* (quoting *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003)). Petitioner does not claim asylum on the basis of a forced abortion or sterilization, nor does she cite other circumstances in this case that would justify a departure from the *Ventura* rule.[5]

Petition for review **GRANTED** and **REMANDED**.

---

[5]This case is also different in procedural posture from *Fedunyak*, a case unrelated to abortion or forced sterilization in which we found a *Ventura* remand unnecessary. In *Fedunyak*, the IJ found that the petitioner was eligible for CAT relief because it was more likely than not that he would be tortured upon his return to the Ukraine; however, the IJ found that he was not eligible for asylum, because, although his mistreatment rose to the level of "persecution," it was not on account of political opinion. 477 F.3d at 1127. The BIA affirmed. We then reversed the BIA with respect to the "on account of" determination. Because the IJ had already determined that the petitioner's mistreatment rose to the level of "persecution," and that it was more likely than not that the petitioner would be tortured if returned to the Ukraine — a determination undisturbed by the BIA — a *Ventura* remand was unnecessary with respect to the asylum and withholding of removal claims. *Id.* at 1130-31. Here, the agency has not yet made a determination whether, if petitioner were believed, she has presented sufficient evidence of a well-founded fear of persecution, or sufficient evidence to support a grant of withholding of removal or CAT relief. A *Ventura* remand is therefore necessary.

GOULD, Circuit Judge, concurring:

I join Judge Pollak's opinion, and write separately to emphasize my personal view on one key issue. As Judge Pollak's opinion points out, "the principal ground for the IJ's adverse credibility finding, not defended by the government, was based on the IJ's view, unsupported by any evidence, that a rape victim in petitioner's position would have gone to a doctor." Judge Pollak's opinion correctly rejects the IJ's position as having been grounded on speculation and conjecture. I wish to add that, regrettably, in many parts of the world, a young woman's report of a rape is likely to bring shame and discredit upon her and her family, as much as it is likely to result in any prosecution of the wrongdoer. Because the victim may be blamed for a rape or in any event subjected to some level of disgrace for it, it is understandable that a young woman like Petitioner Zhu might prefer to maintain silence about a rape. This is all the more so where the rapist is a powerful person in the community. And where recourse to medical treatment is likely to cast a spotlight on the rape with all attendant consequences, it is no wonder that a young woman in such circumstances might not only remain mum but also pass up the possibility of a doctor's help. Such circumstances are not grounds for precluding asylum for a person otherwise entitled to it.